IN RE GUARDIANSHIP OF ROSALIA BLOCHOWITZ.
ANNA GEISTLINGER, APPELLEE, V. ROSALIA BLOCHOWITZ, APPELLANT.
280 N. W. 438

FILED JUNE 28, 1938. No. 30387.

*Clark Jeary, Michael T. McLaughlin* and *Mockett & Finkelstein,* for appellant.

*Ledwith & Ledwith* and *S. M. Kier, contra.*

Heard before ROSE, EBERLY, DAY, PAINE, CARTER and MESSMORE, JJ., and KROGER, District Judge.

MESSMORE, J.

This is an appeal from the verdict of a jury and judgment of the district court for Lancaster county, wherein the jury found that a guardian should be appointed to care for the property of Rosalia Blochowitz, an alleged incompetent.

This action was brought by Anna Geistlinger, a daughter of Rosalia Blochowitz, the petition alleging that Rosalia Blochowitz was possessed of certain property, the exact nature and existing condition and value thereof not definitely known; that she is 85 years of age and is in enfeebled health, and that, by reason of her mental and physical condition, is incompetent and unable to properly care for and manage her property. The petition prays for appointment of a guardian. Frank J. Blochowitz, one of the sons, filed an answer, which is a general denial. Likewise, an answer in the form of a general denial was filed on behalf of Rosalia Blochowitz. Frank J. Blochowitz is designated herein as an intervener resisting the guardianship.

The evidence discloses the following: In 1880 Rosalia

Blochowitz and her husband, Joseph Blochowitz, natives of Poland but of German stock, migrated to the United States, locating near Martel, Nebraska. Through extreme frugality and incessant hard work by themselves and the members of their family, who numbered seven children, one having died in infancy, a great amount of land and personal property was accumulated. On February 20, 1930, Joseph Blochowitz died. On April 4, 1929, prior to his death, Joseph Blochowitz and his wife Rosalia executed four warranty deeds, each in due form, which purported to convey to the four sons certain parcels of land located in Lancaster county, as follows: To Frank J. Blochowitz the southeast quarter of section 14, reserving the payment of $600 to be made annually by the grantee to grantors during their lifetime; to John Blochowitz the northeast quarter of section 14, reserving annual payment of $400 to be made by the grantee to the grantors during their lifetime; to Albert Blochowitz the north half of the northeast quarter of section 11, reserving the payment of $400 annually by the grantee to the grantors during their lifetime; to George Blochowitz the east half of the southwest quarter and the south half of the southeast quarter of section 11, also the east half of the northwest quarter of section 14, reserving annual payment of $800 to be made by the grantee to the grantors during their lifetime, and also reserving two rooms in the premises for the grantors during their lifetime.

The history of the children living follows: Frank J. Blochowitz, the eldest child, is unmarried; Lena Yankton married at the age of 18 years and left the family home; she is now 52 or 53 years old; Anna Geistlinger, a few years younger than Lena, married at the age of 16 years and left the home. The other children are John, who is at home, Albert, who married in 1923 and lives near Raymond, Nebraska, and George, who is at home. Rosalia Blochowitz lives with George and John on what is known as the home place. She does the housework, cooking, takes care of the chickens and works generally as she had been accustomed to work in previous years.

The principal contention is relative to the annuities, as fixed by the deeds and the payments to be made to Rosalia Blochowitz by her sons. The evidence in this respect shows that she generally receipts for the payments to be made by Frank and George, and does not actually take the money, but explains that the boys need it for machinery and horses. Litigation deprived John of his land, which was subsequently sold by the Martel State Bank to Frank, who, in turn, sent a deputy sheriff to the home of his mother with $400, evidencing a year's rent under the deed, which was refused by the mother, perhaps at the suggestions of George, who was present at the time the amount was tendered. This money was brought back and placed in a Lincoln bank by Frank in his mother's name. Albert had previously lost his land, and payments are made to the mother by persons who succeeded to the rights of Albert. The record discloses that John received from his mother some moneys and intermingled such money with his own in the purchase of certain securities in his name. The mother relies implicitly on the boys and believes that she may have the rent payments whenever she desires to have such payments made, even though she has given receipts therefor to the sons, and that if she wants any money the boys will see that she has some, and there is evidence that shortly before this trial she did receive $50, which she placed in a bank at Crete. The evidence also shows that she has a bond, not identified as to kind, in the amount of $1,000. She apparently is unaware of the fact that John and Albert have lost their respective farms and unaware that a lawsuit was instituted against Albert for delinquent payments of rent, as provided for in the deed to him, and that collection was enforced thereon in an amount of over $600. The amounts owing by the sons, to be paid as shown by the deeds, date from 1931, and had such sums been paid as provided for in such deeds, and credited to the account of Rosalia Blochowitz, and had she been mentally competent to manage her business affairs in the usual manner, she would have a sufficient amount of money to give her a

degree of independence, which she does not now possess.

The testimony of Rosalia Blochowitz discloses that she does not know the amounts receivable; nor is she able to distinguish such amounts as may be owing her by her sons. She receipted for the amounts by placing an "X" on the receipts and refused to accept the money. She had not seen her two daughters for some period of time; did not know the number of children in her daughters' families, and when her daughters came to visit her just before the trial of this action, they were told by John that their mother did not want to see them; and, in fact, she remained indoors and did not see them. Likewise, a grandson on several occasions attempted to see his grandmother and was told by George that she was not well or able to be seen. George and John apparently were present in most instances when other members of the family would call on the mother. There is evidence of strained relations existing in the family by virtue of previous litigation, when Anna, her sister and Albert sought to set aside the deeds mentioned. However, the mother had no part in such litigation.

Rosalia Blochowitz's testimony contains many inconsistencies and discrepancies as to age, time, the death of her husband, amounts owing to her by her sons by virtue of the deeds; when the amounts are owing, the exact sums, by whom owing, and the amount of land which the boys have, and the owners of the land from which she received some of the benefits, where such land had been taken over by those outside of the family. All of such facts are indicative of mental incompetency, and that she was unable to comprehend some of the most common things within the knowledge of individuals in similar and like circumstances. This may be attributed in some measure to her inability to properly understand and express herself in the English language. She speaks German and some broken English. All of such facts, however, relate to her mental competency, and, together with all of the other circumstances and testimony in the case, are for the jury, to determine her ability to carry on the ordinary business pursuits of life; that is, to man-

age her business, know the amounts of and understand what money is owing her, and other items in the transaction of business, and were obviously considered by the jury.

The testimony of the witnesses for the intervener and for the alleged incompetent discloses that two of the witnesses for intervener had conversed with Rosalia Blochowitz on the Friday preceding this trial, and had noticed no difference in her conversation than at other times previously when they had conversed with her. However, such witnesses had had no direct business dealings or business relations with her of any kind or nature. One witness for the intervener testified that since 1930 he had seen Mrs. Blochowitz but once. This testimony does not contain one instance which bears upon the mental capacity of Rosalia Blochowitz to manage or control her property or her understanding with reference to her business affairs. Another witness relates a conversation with reference to the time she was "culling chickens;" when Rosalia Blochowitz stated, in substance: "That is nice you are interested in it." Other evidence of the several witnesses, six in number, for the alleged incompetent details primarily the mental condition of Rosalia Blochowitz years previously, and does not specifically or in any manner relate to direct business transactions had with her during recent years. The jury had the benefit of this evidence.

The appellant challenges the sufficiency of the evidence to show by a preponderance thereof that a guardian should be appointed over the property of this alleged incompetent. No exceptions were taken to the instructions given by the trial court, and a careful reading of the same convinces us that the matter was properly submitted to the jury. The jury had the opportunity of considering and weighing this evidence, of observing the general conduct and demeanor of the witnesses while testifying, and especially of the alleged incompetent, Rosalia Blochowitz, and after an analysis of the facts, being the constitutional triers thereof, they concluded that a guardian should be appointed, and so ren-

dered their verdict. Each case involving the guardianship of an incompetent person must, of necessity, stand or fall upon the circumstances and evidence shown and the conditions surrounding the transaction. In almost every instance in cases involving guardianship, the courts have so held.

In this state, section 38-201, Comp. St. 1929, provides: "When the relatives or friends of any insane person, or of any person who, by reason of extreme old age, or other cause, is mentally incompetent to have the charge and management of his property, shall apply to the county court to have a guardian appointed for him," etc.

In the case of *Keiser v. Keiser,* 113 Neb. 645, 204 N. W. 394, this court has pronounced the following law:

"The incapacity of an individual, which, within the statute, will authorize the appointment of a guardian, is a question of fact in each case for the trial court, whose finding thereon will not ordinarily be disturbed. * * *

"The descriptive words, 'mentally incompetent,' 'incompetent,' and 'incapable,' as used (in the statute) mean any one who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause or causes, unable or incapable, unassisted, of properly taking care of himself or managing his property, and by reason thereof would be liable to be deceived or imposed upon by artful or designing persons.

"Mental incompetency or incapacity is established when there is found to exist an essential privation of reasoning faculties, or when a person is incapable of understanding and acting with discretion in the ordinary affairs of life.

"Where a person has insufficient mental capacity for the just protection of his property and his mental condition is such that he is guided by the will of others instead of his own in its disposition, a guardian should be appointed."

Where one is, by reason of old age, disease, weakness of mind, or from any cause, unable or incapable, unassisted, to properly manage his property, he is incompetent, and a guardian should be appointed. *Guardianship of Farr,* 169

Wis. 451, 171 N. W. 951; *Burke v. McClure*, 211 Mo. App. 446, 245 S. W. 62.

In the instant case, there is no suggestion that a guardian should be appointed over the person of Rosalia Blochowitz, but solely over her property, and the appointment of a guardian does not deprive her of the ownership or use of her property, or of the benefits that may be derived therefrom, and can have no adverse effect upon her personal comfort. From the evidence it is apparent, as a matter of fact, that Rosalia Blochowitz never had, in fact, transacted her business, and apparently she is hopelessly unable to do so.

It is argued that Rosalia Blochowitz may never become a public charge; that she is living with her sons who are able to provide for her and who are good to her. However, we believe the real test has been stated in the cases cited in this opinion, and that she is entitled to enhance or enlarge upon her estate by receiving that which is justly due her, as set forth in the deeds of conveyance, and to be paid to her by her sons. This constitutes her estate, and it is not so much a question of her becoming a public charge as it is to conserve the estate, to avoid all probability of such a situation arising. To that end, a guardian would be able to properly preserve her estate. In her present situation she is a dependent, while if her estate were managed in the ordinary manner relating to business, she would be independent.

We believe that we have quoted sufficient evidence from the record and set out sufficient authority to justify the verdict of the jury and the judgment of the district court.

AFFIRMED.