IN RE GUARDIANSHIP OF LEO M. WARNER.
ROBERT RICHARDSON ET AL., APPELLEES, V. LEO M. WARNER, APPELLANT.
288 N. W. 39

FILED OCTOBER 27, 1939.   No. 30538.

*Kirkpatrick & Dougherty,* for appellant.

*W. W. Norton* and *O. S. Gilmore, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and JOHNSEN, JJ.

EBERLY, J.

Robert Richardson and Hazel Richardson filed in the county court of Polk county a petition, alleging that "Leo M. Warner, an inhabitant of and residing in Polk county in the state of Nebraska, is mentally incompetent to have the charge and management of his property;" that said incompetent person is possessed of personal property situated in Polk county of the value of about $4,500 and is also the owner of an interest in real estate situated within the state of Nebraska of the value of about $300; that said incompetent person has minor children dependent upon him for support, and it is necessary for the welfare of said incompetent person and his dependent children that a guardian be appointed for the purpose of taking charge of the property, etc. The petition also sets forth that petitioners are relatives of said incompetent person, being a nephew and a niece of him, and prays for the appointment of E. C. Nordlund as such guardian. Notice of hearing on this petition was served on Leo M. Warner, Eva B. Warner, Floyd M. Warner, Dean M. Warner and Herbert K. Richardson. A demurrer was thereupon filed to said petition by Leo M. Warner, challenging the capacity of the plaintiffs to sue, the jurisdiction of the county court to hear the proceeding, and the sufficiency of the petition to state a cause of action. Thereupon Leo M. Warner filed an answer which carried forward the challenge to the capacity of plaintiffs to sue and to the jurisdiction of the county court, and denied generally the allegations of the petition. On August 16, 1937, being the date to which the hearing on said matter

was continued by consent and agreement of parties, the county court overruled the demurrer of Leo M. Warner, also adjudged that "due and legal service has been had on all parties herein as provided by law, and that the facts set out and alleged in the petition filed herein are true and that said Leo M. Warner is mentally incompetent to have the charge and management of his property," etc. Further, the county court appointed E. C. Nordlund as guardian of said Leo M. Warner. In connection with this judgment there appears a stipulation that service of process was lawfully obtained as provided by law upon Leo M. Warner, the alleged incompetent, herein, and the next of kin of said Leo M. Warner. E. C. Nordlund thereupon qualified as such guardian and gave his official bond which was duly approved on August 26, 1937.

Leo M. Warner appealed from the judgment so entered, and on October 6, 1937, petitioners Robert Richardson and Hazel Richardson filed in this cause in the district court for Polk county, Nebraska, their petition on appeal which contained the essential averments originally set forth in the petition filed by them in the county court of Polk county, Nebraska. To this petition on appeal, Leo M. Warner answered by a general denial. The issues thus made up were submitted by the district court to a jury, which, after hearing the evidence, returned as their findings and verdict "That Leo M. Warner is now incompetent to have charge and management of his property." Thereupon Leo M. Warner filed his motion for a new trial which was by the district court overruled, and thereupon a judgment was entered for petitioners as prayed. This judgment recites, in part, viz.:

"Now, on this 14th day of July, 1938, this matter came on for hearing upon said motion for new trial and for a consideration of the advisory verdict of the jury and after due consideration, the court finds that said motion for new trial should be overruled, and an order and decree entered herein in accordance with the advisory verdict returned by the jury in said matter; further, the court finds that the

allegations set forth in the petition herein are true, and finds generally for the petitioners; further the court finds from the evidence submitted that the said Leo M. Warner is now incompetent to have charge and management of his property, and that the appeal herein should not be sustained, and guardianship affirmed, and the case remanded to the county court for further proceedings.

"It is therefore, ordered, adjudged and decreed by the court, that the motion for new trial filed herein by Leo M. Warner, be, and the same is hereby overruled; that Leo M. Warner is now incompetent to have the care and management of his property and estate; that he should have a guardian to manage and handle his property and estate, and that the appeal in said guardianship matter to this court be not sustained, and that the guardianship findings and decree of the county court should be sustained and the same is hereby affirmed and sustained and said case is hereby remanded to the county court for further proceedings."

From this judgment, Leo M. Warner appeals.

Preliminary to a consideration of the merits of this appeal is the necessity of determining the effect of the submission of the issues to a jury in the district court, and the nature of the verdict returned therein, whether conclusive or advisory only.

"A trial by jury cannot be had in a probate court unless expressly authorized by statute, since such courts, having always proceeded without the intervention of a jury, are not within the application of the constitutional provisions relating to jury trials." 35 C. J. 151.

Section 16, art. V of the Constitution of Nebraska, provides: "County courts shall be courts of record, and shall have original jurisdiction in all matters of * * * appointment of guardians, and settlement of their accounts," etc. This confers on county courts exclusive original jurisdiction over the subject of the appointment and removal of guardians. *Stewart v. Herten,* 125 Neb. 210, 249 N. W. 552.

Also, section 6, art. I of our Constitution, provides: "The right of trial by jury shall remain inviolate," etc. We are

committed to the view that this provision does not create or extend, but merely operates to preserve, the right of jury trial as it existed prior to the adoption of our Constitution of 1875. In other words, it may not be curtailed. *Sharmer v. McIntosh*, 43 Neb. 509, 61 N. W. 727; *Kuhl v. Pierce County*, 44 Neb. 584, 62 N. W. 1066; *Omaha Fire Ins. Co. v. Thompson*, 50 Neb. 580, 70 N. W. 30.

"A jury trial cannot be demanded as a constitutional right in proceedings for the appointment or removal of guardians," in the absence of a statute providing therefor. 35 C. J. 181. See, also, 16 R. C. L. 204, sec. 23.

The general rule seems to be that there is no right to a jury trial in proceedings to determine the question of a person's sanity, except where, as in some jurisdictions, the right is conferred by statute. Indeed, "It is well understood that at common law there was no right of trial by jury in sanity inquisitions." *Sharum v. Meriwether*, 156 Ark. 331, 334, 246 S. W. 501. See, also, *Ex parte Tomlinson*, 1 V. & B. 57; *Crocker v. State*, 60 Wis. 553, 19 N. W. 435; *State v. Linderholm*, 84 Kan. 603, 114 Pac. 857; *In re Brown*, 39 Wash. 160, 81 Pac. 552, 109 Am. St. Rep. 868; *Ex parte Scudamore*, 55 Fla. 211, 46 So. 279; *Hagany v. Cohnen*, 29 Ohio St. 82; *State v. Judge Eighth Judicial District*, 48 La. Ann. 503, 19 So. 475; *In re Bresee*, 82 Ia. 573, 48 N. W. 991; *Black Hawk County v. Springer*, 58 Ia. 417, 10 N. W. 791; *Gaston v. Babcock*, 6 Wis. 502.

"In proceedings not within the application of the constitutional provisions the fact that an appeal is allowed does not entitle the parties to demand a jury, unless the statute so provides." 35 C. J. 195.

The method and effect of appeals in probate proceedings in this state are governed by sections 30-1601, 30-1606, 30-1607, Comp. St. 1929. These are applicable to appeals in actions involving the appointment of guardians. *In re Guardianship of Strelow*, 116 Neb. 873, 219 N. W. 387.

Section 30-1606 provides, in substance, that upon compliance by the appellant with the requirements thereof, the district court "shall be possessed of the action, and shall

proceed to hear, try, and determine the same, in like manner as upon appeals brought upon the judgment of the same court in civil actions." This was enacted in 1881. Our present Code of Civil Procedure, enacted in 1867, expressly abolishes all forms of actions and suits heretofore existing, and provides: "And in their place there shall be hereafter but one form of action, which shall be called a 'civil action.' " Comp. St. 1929, sec. 20-101.

As to the trial of issues arising in the "civil action" thus defined, the controlling terms of our Code are, viz.:

"Issues of law must be tried by the court, unless referred as provided in section three hundred and eight (20-1139) of this Code. Issues of fact arising in actions for the recovery of money, or of specific real or personal property, shall be tried by a jury unless a jury trial is waived or a reference be ordered as hereinafter provided." Comp. St. 1929, sec. 20-1104.

"All other issues of fact shall be tried by the court, subject to its power to order any issue or issues to be tried by a jury, or referred as provided in this Code." Comp. St. 1929, sec. 20-1105.

In view of the many questions which are within the civil jurisdiction of county courts (see *Gainsforth v. Peterson*, 114 Neb. 442, 207 N. W. 935) the statutory language of section 30-1606, Comp. St. 1929, quoted above, does not necessarily imply that the trial of an appeal from the probate court will of necessity involve a jury trial. Remembering the fact that our Civil Code is, at least in a degree, applicable to all our courts, it is obvious that the interposition of a jury is mandatory only when the inherent nature of the issues to be determined, in the light of constitutional and code provisions quoted, or the express terms of statutes which may be involved, so require. This as a principle of procedure has by implication at least been approved by this court in its application of the provisions of section 30-1606, Comp. St. 1929.

Thus, in *Sheedy v. Sheedy*, 36 Neb. 373, 54 N. W. 560, where the matter involved was the payment of an allow-

ance out of an estate to the widow, it was held error to refuse a jury trial on appeal.

And in the case of *In re Estate of Maag,* 119 Neb. 237, 228 N. W. 537, it was determined: "An appeal from the refusal of the county court to make an allowance out of the estate of a deceased husband for the support of his widow is a law action and is triable to a jury unless a jury be waived."

But, in the case of *In re Estate of Scott,* 76 Neb. 28, 106 N. W. 1003, we announced the rule, viz.: "Upon appeal to the district court from an order appointing an administrator, the issue presented by the appeal is one for the court, and should not be submitted to a jury."

Again, in the case of *In re Estate of Wilson,* 83 Neb. 252, 119 N. W. 522, there was presented the question of proper compensation for an administrator, and the court, while not unanimous on other questions involved, without dissent announced the principle that "in the district court the claim should have been tried without the assistance of a jury."

In the instant case, it is manifest that the controlling issue involved is not within the protection of section 6 of our Bill of Rights. Further, it is not an issue arising in an action for the recovery of money or of specific real or personal property, and neither in the court of original jurisdiction nor in the appellate court is there any statute which specifically directs a jury trial. The issues become triable by a jury only in the exercise of the discretionary power of the district court to "order any issue or issues to be tried by a jury." Comp. St. 1929, sec. 20-1105. This, indeed, constitutes our Civil Code authorization of the submission of issues to a jury in suits in equity, and, likewise, in the proceeding now being reviewed; in both it being a matter of discretion and not a matter of right.

"In suits not triable by jury as of right, a verdict of a jury is advisory only." 25 Standard Ency. of Procedure, 1053. In other words, "In suits in which a trial by jury is not expressly provided by statute, the verdict of a jury is advisory only (*Peterson v. Estate of Bauer,* 76 Neb. 652,

661, 107 N. W. 993, 111 N. W. 361) and the court is under no legal obligation to abide by it (*Bank of Stockham v. Alter*, 61 Neb. 359, 85 N. W. 300; *Foxworthy v. Colby*, 64 Neb. 216, 89 N. W. 800). The chancellor in reaching a final conclusion may modify the verdict, reject it *in toto*, or render a decree contrary thereto. The verdict of a jury is not the sole basis of a decree, but the decree must be made as the result of the chancellor's judgment upon the evidence, aided merely by the jury." 14 Standard Ency. of Procedure, 536.

The conclusion supported by the record in the instant case is that, the issues involved not being triable to a jury as a matter of right, the verdict returned therein is not to be deemed conclusive, but treated as advisory only, and the ultimate responsibility for the determination of the facts involved rests with the trial judge and not with the trial jury.

Therefore, in this proceeding, as in appeals in jury trials in equity cases, "Error cannot be predicated upon instructions given or refused by the court. In determining the correctness of the findings in a suit, the appellate court does not review the instructions, but considers the evidence introduced on trial in order to decide the cause on its merits." 14 Standard Ency. of Procedure, 536.

For, it is also a well-established rule of procedure in this state that "Reversible error cannot be predicated on the admission of incompetent or immaterial evidence in equity cases. The trial court is presumed to have disregarded any such evidence." *Lancaster County v. Graham*, 120 Neb. 785, 235 N. W. 338.

In this class of cases, notwithstanding the interposition of a jury in an advisory capacity, the issues involved are ultimately determined by the court, and the final judgment entered herein is within the protection of the rule that, in a case tried to the court, the presumption obtains on appeal that the court, in arriving at a decision, will consider such evidence only as is competent and relevant, and this court will not reverse a case so tried because other evidence was

admitted. *Miller v. Banner County*, 127 Neb. 690, 256 N. W. 639; *American Surety Co. v. First Trust Co.*, 124 Neb. 874, 248 N. W. 697; *McCarter v. Cover*, 122 Neb. 691, 241 N. W. 525; *Hartford v. Pinnie*, 128 Neb. 771, 260 N. W. 371.

The result of the application of the rules of procedure above discussed to the record in the instant case is to reduce the controlling questions for our consideration to two, viz.: (1) The sufficiency of the petition to state a cause of action; and (2) the sufficiency of the evidence to sustain the judgment entered.

As to the sufficiency of the petition, the substance of this pleading is set forth in the first paragraph of this opinion. Even if all reference to the minor dependent children contained therein be deemed surplusage and be excluded from consideration, ample allegations remain which set forth all the required statutory elements essential to the sustaining of the proceeding. In it are set out allegations that "Leo M. Warner, an inhabitant of and residing in Polk county in the state of Nebraska, is mentally incompetent to have the charge and management of his property," and that he is the owner and possessed of certain real and personal property of an alleged value situated within the jurisdiction of the court. It is clear that the pleading attacked states a cause of action, and the technical objections thereto are not well taken. Comp. St. 1929, secs. 38-201, 38-202.

In consideration of the question of the sufficiency of the evidence to support the judgment entered by the district court, the first matter requiring attention is the record of proceedings had in the county court of Polk county, Nebraska, entitled, "In the Matter of Guardianship of Leo M. Warner, an incompetent person," which were instituted by the filing of a petition by Leo M. Warner on March 29, 1929. It was offered in evidence by the petitioners in the district court, and admitted in evidence over the defendant's objection that "the county court of Polk county, Nebraska, did not have jurisdiction * * * of said subject-matter, or of the person of the defendant, and that the same * * * are

incompetent, irrelevant and immaterial." This is, in effect, a collateral attack on the judgment offered.

"A collateral attack on a judicial proceeding is an attempt to avoid, defeat, or evade it, or to deny its force and effect in some manner not provided by law. * * * When a judicial order, judgment or proceeding is offered in evidence in another proceeding, an objection thereto on account of judicial errors is a collateral attack." Van Fleet, Collateral Attack on Judicial Proceedings, 5.

In the present case Leo M. Warner is not charged with insanity, but alleged to be incompetent. In support of this issue the general rule appears to be: "The acts and conduct of a party from his boyhood up are admissible to illustrate his condition of mind at the time of the trial; and so, of course, his sayings, and manner of talk and conversation, as furnishing the best evidence of his mental condition." Woerner, American Law of Guardianship, 411.

We are committed to the rule that, "In a proceeding for the appointment of a guardian for alleged incompetency because incapable of caring for his property, where the person is a party to the proceeding and has not been adjudged insane, his admissions, declarations, and showing of facts inconsistent with mental soundness are admissible as substantive evidence on the issue of sanity." (And this same rule was applied to the decision of the issue of competency.) *Keiser v. Keiser,* 113 Neb. 645, 204 N. W. 394.

The record objected to is a proceeding resulting in an appointment of a guardian for Leo M. Warner as an incompetent. It was commenced by a petition filed by him in the county court of Polk county, Nebraska, on March 29, 1929, as hereinbefore stated. This pleading is both subscribed and sworn to by him, in which it is alleged that the petitioner "is incompetent to handle his business affairs; that he is possessed of personal estate situate in the state of Nebraska of the estimated value of $400 and of real estate of the estimated value of $3,000 net; that it is necessary that a guardian should be appointed for the purpose of taking care of his interest in said estate." A guardian is

therein nominated, whose appointment is prayed for. This record further discloses that upon the filing of this petition, by order of the county court then made and entered, the cause was set down to be heard on April 15, 1929, and it was further ordered "that notice of said hearing be personally served on the said Leo M. Warner fourteen days prior to the said day of hearing." A proper notice of the pendency of said petition thereupon issued out of said court and was personally served on Leo M. Warner by the sheriff of Polk county on March 29, 1929. On April 15, 1929, pursuant to the notice served, a public hearing was had, as by law provided, in the county court of Polk county, the petition sustained, and the prayer thereof granted; and Frank W. Warner was adjudged "a suitable person to have the care and custody of the person and management of the estate of said Inc. (Incompetent), and it further appearing that a guardian should· be appointed," the said Frank W. Warner was thereupon appointed, and he took oath, gave bond, and entered upon his duties as such. Said Frank W. Warner continued to serve in that capacity until the personal estate coming into his possession had been lawfully paid out and applied and thus wholly exhausted. Thereupon he filed a final report, together with his resignation. The final account was duly approved by the county court, and the resignation accepted, and Frank W. Warner was discharged as guardian. The irregularities in this record, on which the quoted objections are based, are, viz.: The omission of the word "mentally" (incompetent) in the complaint; the fact that the petition was signed and verified by an incompetent and not by his "relatives or friends," as required by section 38-201, Comp. St. 1929; and the fact that the petition does not disclose that he was a resident and inhabitant of Polk county and owned property situated therein.

The evidence in the instant case discloses that he was then a *bona fide* resident and inhabitant of Polk county, Nebraska, and the owner of personal property situated therein.

· Webster's New International Dictionary (2d ed.) defines "incompetent" as, viz.: "One who is incompetent, as one incapable of managing his affairs because mentally deficient or undeveloped; as, children and idiots are incompetents in the eyes of the law; one incapable of doing what is properly required; as, these men are *incompetents*."

The defendant relies on *Brandeen v. Beale,* 110 Neb. 686, 194 N. W. 787, to sustain his contentions. Unexplained this case might be deemed to furnish some support for his argument. But when the controversy came before this court a second time, our opinion was reported under the title of *Brandeen v. Lau,* 113 Neb. 34, 201 N. W. 665. We not only determined that it was wholly unnecessary to amend the petition before the court in *Brandeen v. Beale,* 110 Neb. 686, 194 N. W. 787, but that the original petition was ample to vest the county court with jurisdiction. The following excerpts disclose the gist of our second opinion of that case, viz.:

" 'The sufficiency of the petition,' in a court of record, 'is not a test of jurisdiction, as the court may commit an error in holding it sufficient; but this, if the court had jurisdiction, will not render the judgment subject to collateral attack.' *Taylor v. Coots,* 32 Neb. 30.

"The omission of an allegation of a jurisdictional fact, in a judgment of a court of record, is cured by proof of the existence of such fact, and where, in such court, a judgment is rendered, and is silent with respect to a jurisdictional fact, it will be presumed that the court acted within its jurisdiction. Woerner's American Law of Administration (3d ed.) secs. 143-145.

"Jurisdiction of the subject-matter, in a court of record, is to be tested by the authorized extent of the powers of the court in respect of the cause of action before it. Woerner's American Law of Administration (3d ed.) sec. 144.

"In a court of record, it is not essential that every jurisdictional fact appear upon the face of the record, and if a petition sets out facts sufficient to show a cause of action within the general jurisdiction of the court, and no facts

appear upon the face of the record establishing that no jurisdiction exists, all presumptions are resolved in favor of the power of the court to act."

These doctrines were, in effect, upheld and the third decision (a Commissioner's opinion) of *Brandeen v. Beale,* No. 25436 (not officially reported), was made in harmony therewith, as also was the final determination of the matters in dispute in that case made by this court in *Brandeen v. Beale,* 117 Neb. 291, 220 N. W. 298.

Indeed, this result is quite in harmony with the doctrine announced by this court in the early case of *Seward v. Didier,* 16 Neb. 58, 20 N. W. 12, wherein it was determined, viz.: "Where a petition for the appointment of a guardian for a child six or seven years of age was signed in the name of the child, and a guardian was appointed and gave bond, etc., *held,* sufficient to give the court jurisdiction."

"The rules as to collateral attack are applicable with full force to proceedings in rem and quasi in rem, such as adjudications of insanity. * * *" 15 Standard Ency. of Procedure, 400. See, also, *Wirsig v. Scott,* 79 Neb. 322, 112 N. W. 655.

It follows that the county court of Polk county had jurisdiction both of the subject-matter and of the person of the defendant Warner in the proceeding begun March 29, 1929, and upon collateral attack, its judgment and proceedings therein were entitled to full faith and credit, and were properly admitted in evidence by the trial court. *Herter v. Herter,* 97 Neb. 260, 149 N. W. 795; *Holliday v. Shepherd,* 269 Ill. 429, 109 N. E. 976; *Spiers v. Hendershott,* 142 Ia. 446, 120 N. W. 1058; *Chase v. Spencer,* 150 Mich. 99, 113 N. W. 578; *McAllister v. Rowland,* 124 Minn. 27, 144 N. W. 412.

Indeed, this judgment of the county court of Polk county having been entered granting Leo M. Warner the relief expressly designated in his petition, it is not subject to attack by him or in his behalf. 4 C. J. S. 404, sec. 213; *Schoren v. Schoren,* 110 Or. 272, 222 Pac. 1096; *Weander v. Johnson,* 42 Neb. 117, 60 N. W. 353; *Miller v. McGannon,* 79 Neb. 609, 113 N. W. 170.

In determining the sufficiency of the evidence to support the findings and judgment of the district court, appealed from, there are certain facts as to which no serious conflict is to be found in the proof. The defendant was 43 years of age. He had inherited approximately $5,000 in cash, of which he was about to come into possession. He is, and was, without doubt a moron, and his present degree of intelligence and mental competency has existed and remained unchanged for more than twenty years past. The question in fact is not whether the defendant is of impaired mentality, but the degree of mental impairment was for determination by the trial court. On this subject two expert "medical" witnesses testified in behalf of the defendant, and without substantial disagreement classify his degree of mental competency as the intelligence of a child between ten and twelve years of age. The evidence as to the determinative tests is that Warner was unable to perform those of a twelve-year-old child, but was able to successfully carry out the test for the next grade thereunder. These experts, on the basis of their test and observation, testify to the opinion that the defendant is not mentally incompetent to have the charge and management of his property. "It is obvious, however, that the opinions of even medical experts, though worthy of the most careful consideration, and respectful attention, and to be weighed with other testimony in reaching a conclusion, cannot and ought not solely to control the court or jury in the opinion they are to pronounce on the facts before them." Woerner, American Law of Guardianship, 410.

In addition, as lay witnesses, we have relatives and close acquaintances of the defendant, who, in testifying, detail facts and circumstances relating to the conduct and life of defendant, on the basis of which they testify to opinions that the defendant is mentally competent to have charge and management of his property.

Opposed to this proof, we have the evidence of members of his father's family, and others, who, likewise from the basis of observation, which the situation in which they

lived and contact with the defendant accorded them, testify to the opinion that the defendant is mentally incompetent to have charge and management of his property. The facts testified to by certain of these witnesses tend to support the conclusion that the defendant was never competent to, and did not, transact the important business transactions arising during his life; that so long as his father lived he transacted most of the defendant's important transactions for him; that finally, in the year 1929, defendant's mother, and his brothers and sisters, requested Dr. Frank W. Warner, a brother of the defendant, to handle the business and property of Leo M. Warner, the defendant. Circumstances appearing in the record indicate that Dr. Warner complied with these requests, and undertook the duties contemplated thereby. The record shows that it was at this time that the petition for the appointment of Dr. Frank W. Warner as his guardian was filed by the defendant, the signed consent of Dr. Warner to such appointment being indorsed thereon. It is further disclosed by the record that Dr. Warner duly qualified and continued to serve as such guardian until all moneys and personal property then belonging to the ward and coming into his possession as guardian had been disposed of as provided by law and the orders of said court, whereupon his resignation as such guardian was presented to and accepted by the county court, and he was thereupon on June 29, 1936, discharged as such. However, it appears that this order of the county court of Polk county neither expressly nor by implication in any manner changed or modified its determination as to the mental incompetency of defendant as necessarily made and determined in its order of April 15, 1929.

However, the conclusiveness of this evidence need not be determined. So considered, it is clear that the presiding judge in the district court accepted the testimony given in behalf of the plaintiffs and rejected the testimony offered in behalf of the defendant. The trial judge heard the testimony of Leo M. Warner and of the witnesses testifying in his behalf, and also the witnesses testifying for the peti-

tioners. The demeanor of defendant's witnesses was necessarily observed by him, as well as those who testified adversely to the defendant. He accepted as true and correct the testimony of plaintiffs' witnesses and similarly rejected the testimony in behalf of the defendant. The trial judge's opportunity for thus ascertaining the truth was greater than that afforded the members of this tribunal.

In consideration of the entire record, we are impressed with the view that this case was correctly determined. The judgment of the district court is, therefore, in all things,

AFFIRMED.

SIMMONS, C. J., dissenting.

This is an appeal from a decree of the district court holding that Leo M. Warner is incompetent to have the care and management of his property, and affirming and sustaining the findings of the county court to the same effect.

The petitioners, applying for the guardianship, are Robert and Hazel Richardson. Hereafter reference will be made to the petitioners as the plaintiffs, and to the alleged incompetent as the defendant.

The defendant is a man 43 years of age. The plaintiffs are his nephew and niece. The mother of the plaintiffs (sister of the defendant) is dead. As nearly as can be determined from the record, the plaintiff Robert Richardson is a resident either of York or of Polk county. The plaintiff Hazel Richardson is a resident of Holt county, and their father is a resident of either Holt or Boyd county, Nebraska.

The defendant was married in 1923. There are three children. In 1929 the wife sued the defendant for divorce. The decree in full is not in evidence, but it appears that she secured the divorce, and custody of the children was placed in the hands of third parties, at the expense of the defendant.

At the time the divorce proceeding was pending, the defendant, upon the advice of his brother and attorney, filed a personal application in the county court, alleging that he was incompetent, and asking to have a guardian appointed

for him.  As a result of that application, and apparently without notice to any one except the brother, Dr. Frank Warner was appointed his guardian.  Further reference to that proceeding will be made hereafter.

It is in evidence, and not denied, that the purpose of that guardianship was to protect the defendant's property from claims of the wife.  The guardianship proceedings, which were admitted in evidence over the objection of the defendant, clearly sustain the contention of the defendant in that regard.  They show that immediately following his appointment the guardian reported that he had in his possession certain personal property consisting of farm machinery, horses, feed, and household goods valued at $527; that between the time of the guardian's appointment and March 7, 1930, the guardian received a total of $798.54 cash.  Of this, $197 was from money turned over to the guardian by the defendant, reference to which will be made hereafter. The balance came from the sale of the property, machinery, and oats belonging to the defendant.  There was paid out during the first year of the guardianship a total of $629. Of that amount, $590 was paid either to the clerk of the district court, or to others, as alimony and child support. The guardian shows a receipt of $3 on May 31, 1930, and no further receipts.  The last payment was made on March 23, 1931, and thereafter no further action was had, no money received, or paid out, until June 23, 1936, when the guardian reported a balance of $45.47 which he had had on hand, and which was paid out in court, attorney, and guardian fees and expenses.

The defendant testified in this action that his wife was extravagant (and in that his testimony is supported by other witnesses) and that his wife was unfaithful to him. He denied the paternity of the three children.

The defendant inherited real and personal property from the estate of his parents.  In the probate proceedings of his mother's estate, there was over $800 payable to him, which was paid into court by the administrators of that estate, and held by the court.  A partition action was brought by a

sister, and his one-eighth interest in the real estate which he had inherited was sold. Over $4,000 is held by the clerk of the district court as defendant's share of the proceeds of the partition sale.

It appears that, shortly after the divorce action, custody of two children passed as a matter of fact to the father of the plaintiffs. The third child appears to be with an aunt, apparently on the mother's side.

In April, 1937, the father of the plaintiffs herein filed an action against the defendant in the district court for Polk county, asking for the recovery of a substantial sum for the care of the two children. Thereafter a conference was held in Holt county between the two plaintiffs and their father, and it was determined that a petition should be filed asking that the defendant be placed under guardianship. At that time, the defendant had a brother and a sister living in Polk county, and a brother and a sister living nearby in York county. They were not consulted, and were not present at the family meeting when the plaintiffs determined to file the petition in this action. The brothers and sisters did not ask that it be filed. The plaintiff Hazel Richardson did not testify. Neither did the father. Plaintiff Robert Richardson testified that his reasons for filing the petition were that he knew the defendant had money coming to him, that he wanted to see the children cared for, and that he believed the defendant to be incompetent. He was asked twice who prepared the petition in this case for him, and he answered, "An attorney." He did not name the attorney until his attorney instructed him to do so. On cross-examination, he admitted that his father's claim against the defendant, then pending in court, "might have had something to do with" his filing of the petition. However, he denied that his father, or any one else, asked him to file the petition, although he did talk with his father about it. Plaintiff further admitted that his action in this matter was "partly" guided and controlled by the hope that his father would prevail in that litigation. One of plaintiff's attorneys was the county judge before whom the first guardianship

proceedings were had. Plaintiff's attorneys represented the father in his case against the defendant, and they now represent the plaintiffs in this action, who, the petition alleges, are the relatives and "friends" of the defendant.

As to the children, plaintiff Robert Richardson testified that two of them had been living with his father for seven years; that the defendant had never come to see them, written them, sent them gifts or cared about them; that his father was not physically able to continue to care for them and intended to return them to their father (*the alleged incompetent.*)

Robert Richardson also testified that in 1935 he bought a stock tank from the defendant and paid him $4 for it; that it was in good condition; that the value of *a new tank* at that time was $12.50, and that the defendant fixed the price on the tank. That is one of the acts of alleged incompetency of the defendant.

The other act of alleged incompetency, testified to by the plaintiff, was that at one time the defendant, who was then living with his sister, drove her car to the near-by town of Shelby, left it there on the street with the ignition locked, did not advise his sister where the car was, and did not return home until several days later. The sister, testifying for the defendant, explained that she was concerned only as to where the defendant and the car were.

Upon those two acts, plus his observations and associations with the defendant, the plaintiff was permitted to testify that the defendant is incompetent.

A brother of the defendant testified, for the plaintiffs, that, while living, the father took care of all defendant's business, then the mother did so, then a brother, Glen, now deceased, and, finally, Dr. Warner helped the defendant with his business; and that he wanted the boys to have some of the money. The witness himself never had anything to do with defendant's business and never was with him when he transacted it, but observed his actions. He testified that the defendant worked for him on a number of occasions, but was not good help because he would "quit for no good

reason that I know." He admitted that the defendant understood the value of a dollar and knows what is going on. He testified that he did not think the defendant knew the value of an automobile; that the defendant had traded cars and horses upon occasions; that he (the witness) did not know anything about these trades as to prices, values, and exchange conditions. When asked if he knew what his brother was going to do with his money if he got it, he replied that, in the summer of 1937, two men came to his place seeking the defendant, and that "they were out to sell a trailer house." There is nothing further in the record to show that the men ever attempted to sell the defendant a trailer, or that he ever bought one. On those facts, plus his general observations of the defendant, Ray Warner testified that he thought the defendant was incompetent.

It appears from the defendant's witnesses that at one time the defendant did quit working for his brother Ray. Two of the witnesses testified that the reason was that the brother Ray did not pay the defendant for the work which he had been doing.

Plaintiffs also called as a witness the brother, Dr. Frank Warner (a dentist), who testified by deposition. He also testified that the father, while living, transacted most of the defendant's business, and that from 1929 to 1936 he (the witness) handled the business and the property of the defendant at the request of his mother, brothers, and sisters; and, during that time, he sold the defendant's farm machinery and household property. Based upon the business which he transacted for him and observations of him, it was the opinion of Dr. Warner that his brother was incompetent to control and manage his property and that he was easily influenced. However, he admitted that he had not been associated with his brother enough to know if he had squandered his money, and that he did not know of any one who had ever influenced him to do anything that was not right. In his testimony, Dr. Warner did not refer to the first guardianship proceedings wherein he was appointed guardian. However, his testimony covered the

period of his guardianship, and during the period of time Dr. Warner was acting as guardian, from April, 1931, to June, 1936, he transacted no business whatever for the defendant. He did not testify as to any business which he had transacted. His sworn statement before the county judge recites that in that statement he had accounted for all of the estate of defendant that had come into his "possession," or to his "knowledge."

The present county judge was permitted to testify that he had known the defendant since 1927; that he had casually met him in and about the bank, courthouse, and on the street, observed him, and had an opinion as to his competency, and that he entered an order in the county court in August, 1937, placing a guardian over the property and person of the defendant. He recited no facts whatever upon which either his opinion or the order is based.

Plaintiffs offered the testimony of an attorney, who was counsel for the defendant in his divorce action. He also represented Mrs. Dickson in the partition suit. He saw the defendant and was present many times in conferences regarding the estate. In May, 1936, they had a series of conferences, one of which occurred on the street in Osceola. The sister was in a car; the witness standing beside the car talking to her. The defendant was sitting down, leaning over with an elbow on the curb and his limbs out in the street. He talked with them about the partition suit and his share in the property. Upon the basis of that testimony, plaintiffs contend in their brief "that on one occasion he (the defendant) was seen lying in the gutters of the streets in Osceola." The attorney was asked the foundation question, but not permitted to testify as to his opinion of the competency of the defendant. On cross-examination, he testified that he recommended to the defendant's two sisters (who testified for the defendant) that they have a guardian appointed for the defendant. One of the sisters testified that they refused to bring the guardianship proceeding against the defendant.

Defendant was called as a witness for the plaintiffs and

was cross-examined. He testified as to his age; the school which he had attended, the names of his teachers. He attended school for 14 years, and left school when he was in the seventh grade at the age of 19 to help his father on the farm. He left home at the age of 23. He had asked in 1936 about the money which he had coming from his mother's estate, and had not asked about it since, although he clearly knew that he had it coming; that he had a one-eighth share in the real estate; that he had earned $75 in 1937; that he read books, daily newspapers (naming two of them), novels, and magazines. He told when he was married, of his married life, that he treated the family all right, provided for them, and claims that no one had assisted him in business matters; that he bought a car in 1930, paid for part of it in day labor, financed the balance of it, and that Dr. Warner had paid that balance. (This testimony about the payment for the car out of defendant's money is established by Dr. Warner's report in the guardianship proceedings.) He frankly admitted that while he was farming for himself he was not able to secure the same farm for the second year. When asked what he intended to do with his money if he received it, he replied that he intended to pay his bills and put the rest of it in government bonds. When asked what interest government bonds paid, he said he did not know exactly. While on the stand subject to this examination, he was asked to figure 4½ per cent. interest on $4,000 for a year. He was unable to reach the correct answer.

Plaintiffs offered no expert witnesses. Defendant called as a witness Dr. A. E. Bennett, of Omaha, a specialist in mental and nervous diseases. He had examined the defendant, who told him that it was his desire to remove guardianship proceedings pending against him, and that his relatives wanted to get his money. At this examination he was accompanied by his sister. He told of his disagreement with his wife, and said that he had accepted the guardianship on the advice of a brother and an attorney for the reasons herebefore set out; that for a year and a half he

turned his wages over to his attorney, and that after that he had managed his own affairs; that his brother resigned as guardian in 1936; that in 1937, when he was to get this other money, the relatives were trying to prevent it.

Dr. Bennett testified that his statement with reference to why the guardianship proceedings were brought was a normal reaction; that the defendant had a poor grasp of general information; that he did not have the grasp of the "higher intellectual group;" that he had no delusions, no defective memory, no disturbances in mental retention; that he was poor in calculation and simple arithmetic; that his mental age was between 10 and 12; and that in his opinion, based upon the examination which he made and the information furnished by the defendant, the defendant was competent to have charge of and manage his property, and use ordinary intelligence and discretion with reference thereto; that he had a "moderate degree of intelligence retardation, which is well within the normal averages for a great many individuals who are self-supporting and able to adjust themselves at the level that he is called upon to adjust himself to;" that he was a "high-grade moron;" that he was more susceptible to influence than those of a higher mental rating, but that there were plenty of such individuals of his mental capacity who handle their own affairs, and while he might at times require some guidance in the management of his property "most of us do;" and that it was nothing unusual for people in that class to handle larger sums of money than $5,000, and that brilliant men often dissipate property more easily than the less brilliant.

Defendant also offered the testimony of Dr. J. S. Bell, of York, a general practitioner and surgeon. He testified that he had examined the defendant; that the defendant's mental capacity is a little below the medium grade of intelligence, but more than a ten to twelve-year-old child; that he was able to handle his own affairs with ordinary discretion; that he would not be generally guided by persons of stronger minds, nor more likely to be influenced "than any of the rest of us."

Seven of the defendant's neighbors also testified for him. They had known him for an average of 20 years or more. They were not interested in the outcome of the litigation. Some of them had worked with him. He had worked for some of them. All testified that he was a good worker; that he knew about his wages and had no extravagant habits. Several testified that, with the defendant, they had attended horse sales and sales of other types of property, and that the defendant's judgment was good; that he was as capable as the majority of people; that they knew of no reasons or facts upon which a charge that he was incompetent could be based. Testifying also for the defendant were his nephew and brother-in-law. They were with him on some of his car and horse trades; and, in their opinion, he received good value in these trades; and was fully competent.

His sister, with whom he is now living, testified for him that he had traded cows for her; had purchased property for her at sales; that he handled property in a very satisfactory way, and that he was as competent as any one of them to handle the property he would receive from the estate.

His other sister, Mrs. Dickson, also testified. Corroborating the other witnesses, she testified that in her opinion he was perfectly competent to manage and control his property. She was the plaintiff in the partition suit that was started in February, 1935. On cross-examination, it was pointed out that, in that petition which she signed, her brother was designated as an incompetent. She testified that that was done by the attorney, who told her that it was necessary to so designate him because of the guardianship proceedings and its effect upon the title of the property; that the guardian originally was appointed for him because of the divorce action, and that as long as it was pending it was necessary that he so be designated. She was also one of the administrators of her mother's estate. She testified she paid the money into court because the attorney and the county judge advised her that should be done. That also was not denied. She testified that she was appearing for her brother because she wanted him to get "a fair deal."

Called in rebuttal, the witness, Ray Warner, was asked further about the horse trades and testified that upon one occasion the brother had gotten a horse in a trade that was a "kicker."

It will thus be seen from an examination of this testimony that the factual basis of defendant's alleged incompetency is distinctly meager. With the exception of those incidents, the only supporting evidence upon which a finding of incompetency is based is the testimony of the plaintiffs' witnesses based upon general observations of the defendant, and the allegedly void guardianship proceedings.

There is no evidence in this record that the defendant was ever extravagant, wasteful, or careless with his money. There is no evidence that he was ever overreached or improperly influenced or deceived or imposed upon, unless it should be when he accepted the advice of his brother and attorney and personally asked that a guardian be appointed for himself.

The plaintiffs argue in their brief in this court that he has done little, if anything, in the last several years; that in 1937 he earned but $75. It may be pointed out that as a result of the guardianship proceeding in 1929, and the sale of his farm equipment, he was left without money or property to enable him to operate a farm. Subsequent to that time, it appears that he has, through labor for neighbors and relatives, earned his own way and cared for himself.

The extent to which his doctor brother thought defendant was incompetent to handle his business affairs is demonstrated by the guardianship proceeding. The guardian brother in that report shows that during the period from April 13, 1929, to September 20, 1929, the defendant paid to the guardian a total of $197, an average of almost $40 a month. Evidently the guardian allowed the alleged incompetent to collect his own wages. During the period from April 15, 1929, to April 9, 1930, a total of $23.40 was paid out of those funds for clothing for the defendant. Subsequent to that time, although the defendant continued to

work, accumulate property, make automobile and horse trades, etc., the guardian did not exert any control over his wages or over his property. After April 9, 1930, the guardian reports the receipt of but $3, and after April 23, 1931, the guardian neither received nor paid out anything until he made his final report in June, 1936. The partition suit, involving the brothers and sisters, was started in 1935. At that time, the first guardianship in Polk county had not been closed and the guardianship was in force. The mother's estate was then being probated, out of which a substantial amount of money became due the defendant. In the face of those facts, the defendant's brother, Dr. Frank Warner, made his final report, petitioned for his discharge as guardian, and did not ask that any one else be appointed guardian in his stead, and no one else was appointed in his stead.

It was not until after plaintiffs' father attempted to secure a judgment against the defendant that the plaintiffs, without consultation with the brothers and sisters of the defendant, initiated this guardianship proceeding. It is obvious that the conclusion of the defendant that some of his relatives wanted to get his money was a rational conclusion.

All persons are presumed to be sane and competent. An individual is entitled to the control of his own property unless good cause is shown for denying that control to him. *Keiser v. Keiser,* 113 Neb. 645, 204 N. W. 394. The burden of proof was upon the plaintiffs to establish that the defendant was "mentally incompetent to have the charge and management of his property." Comp. St. 1929, sec. 38-201. Woerner, American Law of Guardianship, 408, sec. 124. *In re Phillips,* 158 Mich. 155, 122 N. W. 554.

The Nebraska statute and the Michigan statute are in almost identical language. This court has often cited and followed the Michigan court in interpreting our guardianship act. *Mental* incompetency must be established. "The statute does not say merely 'incompetent,' but 'mentally incompetent.' It does not refer to persons who are sane, but

not, perhaps, as wise or intelligent as some other persons. It applies to those whose mind is so affected as to have lost control of itself to such a degree as to deprive the person afflicted of sane and normal action." *In re Guardianship of Storick*, 64 Mich. 685, 31 N. W. 582. Here it is noted that the plaintiffs' witnesses were not limited by their questions to the mental incompetency or incompetency of the defendant, but were asked merely as to their opinion of defendant's competency.

The power, vested in the courts, to place a guardian over a person or his property should not be exercised except in cases that clearly require that action. 32 C. J. 632; *In re Guardianship of Wilson*, 23 Ohio App. 390, 155 N. E. 654; *McCammon v. Cunningham*, 108 Ind. 545, 9 N. E. 455; *In re Bryden's Estate*, 211 Pa. St. 633, 61 Atl. 250.

It was early held in Michigan: "The fact that a man is unable to provide a comfortable and suitable maintenance for his family, even when coupled with the fact that he makes foolish bargains and squanders all he earns, is not made by either statute a reason why he should have a guardian appointed over him. If it were, a goodly number of people would be under guardianship. * * * The power of appointment of a guardian by the probate court is derived from the statute, and, in order to obtain jurisdiction in such cases, the statute must be strictly pursued." *Partello v. Holton*, 79 Mich. 372, 44 N. W. 619. See *North v. Joslin*, 59 Mich. 624, 26 N. W. 810; *In re Guardianship of Bassett*, 68 Mich. 348, 36 N. W. 97; *In re Guardianship of Storick*, 64 Mich. 685, 31 N. W. 582.

"An improvident business transaction may be competent evidence in support of an application for guardianship; most of the acts of a respondent in such a case are competent as going to show the mental condition. *But such an improvident act becomes cogent proof of mental incompetency only as it is reinforced and explained by other facts and circumstances.*" (Italics mine.) *In re Chappell's Estate*, 189 Mich. 526, 155 N. W. 569.

In *Keiser v. Keiser, supra,* this court said:

"*It is not sufficient that incompetency alone is established,* for it may well be, even where incompetency exists, that the situation and surroundings of the incompetent are such that no necessity exists for the appointment of a guardian, and that no good purpose would be served thereby. * * * But the present proceeding is under a statute, one of whose purposes is, indeed its chief purpose is, to prevent the necessity of such actions; and, while each individual is entitled to control his own property, the legislative intent was to prevent its dissipation in litigation over contracts secured by improper persons through improper means and *to save to the owners of such property* that which age and disease have made them unable and incapable to save for and to themselves. (Italics mine.) * * *

"Mental incompetency or incapacity is established when there is found to exist an essential privation of reasoning faculties, or when a person is incapable of understanding and acting with discretion in the ordinary affairs of life."

The real cause for the bringing of this proceeding is the desire of plaintiffs to aid their father in the collection of an alleged claim against the defendant. Guardianship proceedings are not intended to be a substitute for attachment or proceedings in aid of execution. Courts have repeatedly condemned the bringing of proceedings of this character by expectant heirs, for the purpose of conserving an estate for their inheritance. This proceeding presents a situation far more subject to condemnation. The plaintiffs herein are dominated by the selfish interest of aiding their father in the collection of a claim, rather than the unselfish interest of friends having the welfare of the defendant uppermost in their minds. Nowhere in this record is there any evidence indicating that these plaintiffs have ever been concerned about the defendant or his welfare.

It may here be pointed out that section 38-201, Comp. St. 1929, authorizes the "relatives or friends" of the alleged "mentally incompetent" person to apply for the appointment of a guardian. The brothers and sisters of the

defendant, living in the jurisdiction of the county court of Polk county, did not apply for this guardianship. While the plaintiffs are legal "relatives," their friendship for the defendant may well be questioned on this record. That the statute contemplates that this action shall be brought by persons friendly to the alleged incompetent is not open to serious question.

"The court will guard with peculiar care the alleged lunatic from interference springing from a hostile motive, and will weigh with more precision the evidence, if the person by whom it is tendered appears to be actuated by a sinister intent." Woerner, American Law of Guardianship, 408, sec. 124.

"Each case involving the guardianship of an (alleged) incompetent person must, of necessity, stand or fall upon the circumstances and evidence shown and the conditions surrounding the transaction." *In re Guardianship of Blochowitz*, 135 Neb. 163, 280 N. W. 438.

After a careful reading of this entire record in the light of the circumstances and conditions therein disclosed, I am convinced that the appointment of a guardian for the person and property of the defendant is not justified and is not authorized by the statute under which this proceeding was had.

In my opinion the judgment of the district court should be reversed and the case dismissed.