MURPHY et al. v. GARFIELD OIL CO.

No. 11419—Opinion Filed July 24, 1923.

Rehearing Denied April 15, 1924.

1. Oil and Gas—Cancellation of Lease—Equitable Action.

An action to cancel an oil and gas lease on the ground of forfeiture by reason of lessee's failure to pay or tender or deposit delay rentals is an equitable action and must be based upon the principles of equity and righteous dealing.

2. Equity—Maxims—"Clean Hands."

He who invokes the jurisdiction of a court of equity, "must come with clean hands," and "who has done inequity cannot have equity."

3. Same—Action to Cancel Oil Lease.

Where plaintiff brings an action to cancel an oil and gas lease in the hands of an assignee, on the ground of forfeiture by reason of lessee's failure to pay, tender, or deposit delay rentals as provided in the contract, and it appears that the plaintiff considered the contract void for the reason it was made to be void for him and the original lessee by verbal agreement; that it was not to be recorded or assigned, but was to be used by the lessee in assisting him in securing other leases and was to be returned to him after the block of leases was obtained; and it further appears that he objected to the assignee, defendant, going upon the leased premises to develop the same, and refused to accept delay rentals or royalties when tendered him and threatened to do violence to the lessee, his agents, and employes if other tenders were made to him and interfered with the flow of gas from the gas well drilled on the premises by the lessee during the first year of the contract, for

the purpose of annoying the lessee and preventing his transporting the gas from the premises, he cannot come into court with clean hands and without iniquity, and the court will refuse to grant equitable relief and will leave the parties where it found them.

### 4. Oil and Gas—Lease—Term for Exploration.

Where an oil and gas lease is made for a term of five years, or as long thereafter as oil or gas is found in paying quantities, the five years is the initiative period and is for the purpose of testing and exploring the premises for oil and gas.

### 5. Same—Construction of Lease—Delinquency.

Where the lease contract provides that a well must be completed within the first year of the contract or the contract will terminate unless on or before the last day of the first year a stipulated sum is paid or tendered or deposited as delay rental for the second year, and in another provision of the contract it is provided that if the first well is a "dry hole," then another well must be completed within the next twelve months or delay rentals paid, tendered, or deposited, to keep the contract in force, the first well mentioned means a well producing oil or gas or both, whether in paying quantities or not, and is sufficient for all purposes to prolong the life of the lease for the initiative period of the contract subject only to reasonable diligence and good faith in exploring and developing the property to obtain these elements in paying quantities.

(Syllabus by Threadgill, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Garfield County; J. C. Robberts, Judge.

Action by W. K. Murphy and another against the Garfield Oil Company. Judgment for defendant, and plaintiffs bring error. Affirmed.

Stuart, Sharp & Cruce and John F. Sharp, Jr., for plaintiffs in error.

Edw. H. Chandler, Summers Hardy, and Robt. L. Imler, for defendant in error.

Opinion by THREADGILL, C. W. K. Murphy and M. Elmer France, the plaintiffs in error, brought suit against the defendant in error the 20th day of July, 1918, for the purpose of canceling an oil and gas lease on the N. E. ¼ of section 23, township 22 north, range 4 west, in Garfield county, Okla.

The conditions in the lease contract drawn into question, the breach of which is alleged as the basis of suit, are as follows:

"2nd. To pay lessor each year in advance for the gas from each well where gas only is found, while the same is being used off the premises, lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the well at his own risk and expense.

"3rd. To pay lessor for gas produced from any oil well and used off the premises at the rate of $250 per year, for the time during which such gas shall be used, said payments to be made each three months in advance.

"If no well be completed on said land on or before the 17th day of February, 1917, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the Farmers State Bank at Garber, Oklahoma, or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of $160 dollars, which shall operate as a rental and cover the privilege of deferring the completion of a well for 12 months from said date. In like manner and upon like payments or tenders the completion of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment covers not only the privilege granted to the date when first said rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred. If while this lease is in force and prior to the discovery of oil or gas on said leased lands, there shall be drilled on adjacent land and within 200 feet of any line of said leased land a well producing as much as 25 barrels of oil per day for 30 consecutive days, the lessee will with reasonable diligence begin and prosecute the drilling of a well on said leased land in a faithful effort to find and produce oil in paying quantities.

"Should the first well drilled on the above described land be a dry hole, then and in that event, if a second well is not completed on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties, unless the lessee on or before the expiration of said 12 months shall resume the payment of rentals in the same amount and in the same manner as hereintofore provided. And it is agreed that upon the resumption of the payment of rentals as above provided, that the last preceding paragraph hereof, governing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments."

The plaintiffs contend that W. K. Murphy was the owner of the land and that M. Elmer France had an oil and gas lease from Murphy dated July 13, 1918. and they contend that the defendant holds an oil and gas lease by assignment made by W. K. Murphy to B. A. Garber February 17, 1916, that said lease was obtained and placed of record in a fraudulent manner, but this contention was not insisted on in the trial court and is not urged here. The plaintiffs contend that the lease held by the defendant was void because of the following facts: The lease provided in case no well was drilled on the land on or before February 17, 1917, that the lease should terminate, unless on or before that date delay rental should be tendered to the lessor or deposited to the credit of the lessor in the Farmers State Bank of Garber in the sum of $160, which would toll the contract for another year; that this condition was broken; the lessee did not complete a well by that date and has never completed one, nor did it pay or tender to the lessor the sum of $160 for the year 1917, or deposit same to his credit in the bank; that the lessee made no tenders of delay rental nor deposited same in the bank for the year beginning February 17, 1918; that by reason of the failures to comply with the contract in these particulars the lease should be canceled of record and the title to the land quieted in the plaintiffs.

The defendant contended that it drilled and completed a gas producing well on the premises by the 16th day of February. 1917, which produced 4,000.000 feet of gas per day. That on the 10th day of February, 1917, before completing the gas well, it tenderd to Murphy the sum of $160, as rental for the year beginning the 17th day of February, 1917, and again on the 17th day of February, 1917, made a like tender and at same time offered to pay the royalty money for gas from the well as provided in said lease; that both of these tenders were refused; that Murphy not only refused the payments but threatened its agents with violence and ordered them off of his premises and out of his presence and declared he would not accept rentals or royalties from the defendant; that it made no other tenders of rentals or royalties because of Murphy's actions in refusing the rental and royalty in 1917. It contended, further, that Murphy from time to time annoyed and interfered with the gas well and destroyed it, and he was estopped by reason of his conduct.

The plaintiffs by reply contend that if de-

fendants drilled a gas well it abandoned the same in the belief that the land would not produce oil or gas in paying quantities, and for that reason it did not pay or tender rental for the year commencing February 17, 1918. That about August 1. 1918, after the defendant had knowledge of the lease given to France, it commenced drilling a second well upon the said land.

The defendant filed a supplemental answer, contending that the second well was drilled on said land at an expense of $43,000 and said well was producing oil in paying quantities; that upon the written order of plaintiff Murphy it had set apart for his use and benefit one-eighth of the oil obtained from said well; that the plaintiff France paid no consideration for the lease he held and had no greater rights under the same than Murphy, and that both parties plaintiff were estopped to declare a forfeiture. The plaintiffs filed separate replies, consisting of general denials and contending that the second well was drilled without their consent and the defendant was a trespasser in entering upon the said land and drilling said well.

These issues were tried on November 11, 1919. The jury was impaneled to pass upon certain questions of fact and certain interrogatories were submitted by the court to the jury for special findings, and upon the findings of the jury the court rendered judgment generally in favor of the defendant, Garfield Oil Company.

The plaintiffs in error in their brief state that they will not contest the question as to whether the rental for the year commencing February 17, 1917, was tendered to the lessor, and the question for consideration narrows itself down to whether or not the rental for the year commencing February 17, 1918, was paid or tendered to W. K. Murphy, or to his credit in the Farmers State Bank of Garber. They say it was necessary to pay or tender this delay rental to keep the contract in force and it was not paid or tendered.

The defendant in error contends that it was not necessary to pay or tender this delay rental.

1. In passing on this question we may presume the oil and gas lease contract between, the parties was a satisfactory contract and was for the purpose of exploring, drilling for, and developing oil and gas on the leased premises. The relation of the parties and their duties to each other are fixed by the terms of the contract, and to determine whether or not the lease was

kept in force it will be necessary to consider the terms of the same and the facts as revealed by the testimony. The contract provided three methods of keeping the same in force for the first five years: First, by paying or tendering or depositing in bank advance rental of $160 for each year, after the first year; second, in lieu of delay rentals, drill and complete a dry hole every year except the last year; third, in lieu of delay rentals, drill and complete an oil or gas well and use reasonable diligence in producing oil and gas in paying quantities. These three methods were open to the defendant in error during the five-year initiative period of the lease while it was exploring and searching the underground premises for oil and gas, and the life of the lease after this initiative period depended upon whether or not oil and gas were found and produced during the first five years in paying quantities.

The testimony shows that before the end of the first year, and before completing an oil well on the premises, the defendant tendered to the plaintiff Murphy $160 as the delay rental for the second year of the contract, which was refused by him, and on the 15th day of February, 1917, being two days before the end of the year, the defendant brought in a gas well producing about 4,000,000 cubic feet of gas and on the 17th day of February, 1917, the day the first year of the lease expired, the defendant tendered to the said plaintiff $250 as royalty for one year for the gas well and $160, the delay rental, both of which were refused by the said plaintiff, and it may be conceded that there was no offer on the part of the defendant to pay delay rentals at the end of the second year, and the gas well, after six or seven months, ceased to produce.

2. This is purely an equitable action and the parties and subject-matter must be governed by the rules of equity. The plaintiffs in error appear in this sort of court and seek to have the oil and gas lease contract canceled on equitable grounds, and they must comply with the principles of equity. The plaintiff Murphy executed the contract to Garber on the 17th day of February, 1916, signed it and acknowledged it, and with a verbal agreement, he says, that it was to be placed in escrow, not to be recorded or assigned, and was made only for the purpose of assisting Garber in getting leases in that neighborhood, and when the block of leases was obtained, as desired, his contract was to be returned to him; between him and Garber it was a decoy. Gar-

ber placed the lease on record and by assignment it became the property of the defendant. On this statement of facts we do not think a court of equity would give the plaintiffs any relief from the contract, but would leave the parties where it found them. This was one of the grounds of plaintiffs' cause of action which was abandoned and does not command our attention. For the purpose of this appeal the plaintiffs concede the validity of the contract, otherwise they would be in no better attitude in asking the court to set it aside on the ground of breach of condition than in asking a cancellation in the first cause of action, for the reason they would be complaining of the breach of a void contract and seeking to set it aside because of such breach, which would be inconsistent, and the court would have to leave them where it found them. They cannot be heard to say the contract is void, its terms of no force and effect, and at the same time insist on its conditions and ask it to be canceled because its conditions were broken by the defendant.

3. With this understanding that the contract was a valid and subsisting contract between the parties, we may observe their conduct toward each other and consider the terms of the contract and the law applicable to the case to determine whether or not the plaintiffs were entitled to the relief prayed for.

The defendant entered upon the premises to commence its first well in December, 1918; the plaintiff Murphy objected to the defendant's drilling, opposed its agents and employes going upon the premises. On the 10th day of February, seven days before the end of the first year of the lease, the defendant tendered to the plaintiff $160 as delay rental to keep the lease in force for the year commencing February 17, 1917, and ending February 17, 1918, which tender was refused by the plaintiff with bad, ugly language and threats of violence to the agent of the defendant making the tender. On the 17th day of February, 1917, the defendant again made a tender of payment of the delay rental, and as a gas well had come in, also offered him the advance royalty of $250 for this gas well, both of which offers he refused again, using profane language and threats of violence to the agent of the defendant. His conduct toward the defendant and his attitude toward this contract as found by the jury in the trial of the case are as follows:

"Q. If you answer the foregoing interrogatories 12, 13, and 15 in the affirma-

tive and thereby say that plaintiff, Murphy. did refuse to accept said tenders, did he also say to the agents of the defendant who made said tenders, in substance, 'that he would not at any time in the future accept any rentals or royalties from the defendant under the terms of said lease, and that it would be useless for the defendant to make any further tenders thereof?'

"A. Yes. Fred C. Gensman, Foreman.

"Q. Did the plaintiff, Murphy at any time when said tenders were made or offered threaten to do bodily harm to any one who attempted to make further tender of payments to him for the defendant to go upon said lease or who attempted to go upon said lease to drill or operate a gas or oil well thereon?

"A. Yes. Fred C. Gensman, Foreman.

"Q. Has the defendant, Garfield Oil Company, at all times been willing and able to pay plaintiff any and all sums due under and by virtue of said lease as rental for delay in completion of a well thereon and for rentals due for well number one.

"A. Yes. Fred C. Gensman, Foreman.

"Q. Did the plaintiff, Murphy, close the gate valve on said well or pull the core from the stop-cock in the gas line leading therefrom to defendant's gas line along the public highway or otherwise mutilate the equipment of the defendant and thereby prevent the defendant from using the gas in said well?

"A. Yes. Fred C. Gensman, Foreman."

"Q. Has the plaintiff, Murphy, at any and all times objected to the employes of the defendant going upon the premises involved for the purpose of complying with the terms of the oil and gas lease in controversy herein?

"A. Yes. Fred C. Gensman, Foreman.

"Q. Has the defendant, the Garfield Oil Company, offered to develop the leased premises in accordance with the terms of its lease and particularly to drill such offset wells as may be necessary?

"A. Yes. Fred C. Gensman, Foreman.

The finding of the jury as above stated is conclusive in this court as to the attitude and acts of Murphy toward the defendant and the contract in question. After all these inconsistent acts of said plaintiff— claiming he made the contract in bad faith; never intended it to be placed of record; made it to mislead his neighbors; never considered it a valid contract; had not changed his mind even in the trial of the case; objected to the defendant's drilling on his land under the terms of the contract; refused, with profane language and threats of violence, to accept the delay rental money

and the gas royalties offered him by the defendant and ordered its agents not to make any more offers; when the gas well came in, tampered with it to prevent its success; closed the gate valve and pulled the core from the stop-cock in the gas line to prevent connection with the said line outside the premises; leased the land to the plaintiff France, July, 1918, for oil and gas for an extra bonus of $25,000, with the understanding that France was to assist him in getting rid of the defendant's lease; brought this action in 1918, while the defendant was drilling its second well, which was a successful oil well on the premises. Then without allowing France to know, he signs an order authorizing the defendant to set aside his one-eighth royalty from the oil well. In filing this suit, this plaintiff, Murphy, sets out two causes of action inconsistent with each other. He claims the contract was made to be void, was only a decoy to his neighbors, and in the other cause of action the contract is valid, but the defendant has not complied with its terms. The first cause he abandons and only urges the second in the trial and prosecution of the action. It is a rare case of inconsistency and bad faith on the part of the plaintiffs in a court of equity. They have not a single good act to commend them to the court. They cannot say they have clean hands and a good conscience and have done no iniquity. Their conduct does not come within the rule required in a court of equity and as defined by Justice Brewer, United States Supreme Court, in Deweese v. Rinehard, 165 U. S. 386, 41 L. Ed. 757, as follows:

"A court of equity acts only when and as conscience commands and if the conduct of the plaintiff be offensive to the dictates of natural justice then whatever may be the rights he possesses and whatever use he may make of them in a court of law he will be held remediless in a court of equity."

The rule is stated by Justice Sandborn of the Circuit Court of Appeals for the 8th Circuit in Michigan Pipe Company v. Fremong, etc., Company, 111 Fed. 284, 49 C. C. 324, as follows:

"A court of equity is the forum of conscience. Nothing but good faith, the obligations of duty, and reasonable diligence will move it to action. Its decree is the exercise of discretion; not of an arbitrary and fickle will, but of a wise judicial discretion, controlled and guided by the established rules and principles of equity jurisprudence. One of the most salutory of these principles is expressed by the max-

ims, 'He who comes into a court of equity must come with clean hands,' and 'He who has done iniquity cannot have equity.' A court of equity will leave to his remedy at law—will refuse to interfere to grant relief to—one who, in the matter of transaction concerning which he seeks its aid, has been wanting in good faith, honesty, or righteous dealing. While in a proper case it acts upon the conscience of a defendant to compel him to do that which is just and right, it repels from its precincts remediless the complainant who has been guilty of bad faith, fraud, or any unconscionable act in the transaction which forms the basis of his suit."

The rule is also stated by Justice Pomeroy in his great work on Jurisprudence, sec. 398, as follows:

"It is not alone fraud or illegality which will prevent a suitor from entering a court of equity, any really unconscionable conduct connected with the controversy to which he is a party will repel him from the forum whose very foundation is good conscience."

Again, Mr. Pomeroy, in volume 1, paragraph 397, states as follows:

"On the other hand, the maxim now under consideration, 'He who comes into equity must come with clean hands,' is much more efficient and restrictive in its operations. It assumes that the suitor asking the aid of a court of equity has himself been guilty of conduct in violation of the fundamental conceptions of equity jurisprudence, and therefore refuses him all recognition and relief with reference to the subject-matter or transaction in question. It says that whenever a party who, as actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principle, in his prior conduct, then the doors of the court will be shut against him in limine; the court will refuse to interfere in his behalf, to acknowledge his right, or to award him any remedy."

Taking into consideration all the facts and circumstances as brought out in the testimony and as found by the jury in the trial of the case and under the rule as above stated, we cannot see how the plaintiff Murphy can come into a court of equity and be permitted to prevail in seeking to cancel the lease contract on the ground of forfeiture, by the defendant's failure to do the very things the plaintiff did his best to prevent and which he had, at all times, contended it had no right to do; nor can we see where the plaintiff France is in any better odor than Murphy. He knew the history of the controversy and contracted to assist his coplaintiff in getting rid of

the defendant's contract. If they prevail in an action of this sort, the rules of equity count for nothing. We do not think the plaintiffs have done equity. We do not think they are blameless, but culpable, and we do not think they are entitled to equity.

4. The plaintiffs contend that it was necessary for the defendant to pay or tender to the plaintiff Murphy, or deposit to his credit in the Farmers State Bank, at Garber, Okla., the delay rental for the year commencing the 17th day of February, 1918, in order to keep the lease in force. The defendant contends that it was under no obligation to make such tender or deposit, for the reason it had complied with the conditions of the contract to keep it in force by drilling and completing the gas well on the premises within the first year of the contract and this gas well was sufficient for all purposes to keep it in force for five years subject to reasonable diligence and good faith in continuing the work of exploring the premises for oil and gas and developing the same in paying quantities. The testimony shows that the defendant did drill and bring in a gas well during the first year of this contract, not a very strong flow of gas, but producing about 4,000,000 feet of gas per day and which ceased to produce gas after six or seven months.

Construing paragraphs 4 and 5 of the contract together, we find two provisions relative to wells and their value in prolonging the life of the lease. If the wells drilled were dry holes, one a year for four consecutive years would be necessary to keep the contract in force for the initiative period. If an oil well or gas well drilled, whether oil or gas was in paying quantities or not—just so oil or gas was obtained—not a dry hole—one such well was sufficient to prolong the life of the contract for the initiative period and to keep the contract in force; after the initiative period oil or gas in paying quantities were necessary. The first five years of the contract is given for the purpose of exploring, and a well with any showing of oil or gas is sufficient consideration under the terms of this contract for this period, but oil or gas in paying quantities must be had to continue the contract after this period, and this is reasonable.

The business of exploring for oil and gas and of producing the same is uncertain and expensive. One must command large capital and take a long time to drill a well in search of these elements. There is nothing certain as to where they are situated in

the earth and there is no way of knowing except to send the drill into the earth. After all the work and the great expense, the result is more often than otherwise a dry hole and the lessee loses his time and money and has no encouragement to continue the adventure. Sometimes the result is a small showing of oil and gas and the lessee is encouraged to continue the adventure, and it is only reasonable and right that he should have the full exploring period set out in the contract to make successful the adventure.

The well drilled by the defendant within the first year of the contract was not a dry hole, but a producing well, and the gas was piped and used until the plaintiff Murphy tampered with it and pulled the core from the stop-cock and let the gas escape into the air, and the defendant was doing its best to utilize the gas from the well and offered to pay the $250 advance royalty, which was refused by the plaintiff, and under all the circumstances, the defendant was exercising reasonable diligence in further operations on the leased premises, and in the summer of 1918 brought in a successful oil well.

Taking the view of the contract we do, and considering the undisputed facts as to the gas well brought in by the defendant within the first year of the contract and the tender of advance royalty and its reasonable diligence in further operations on the premises and the conduct of the plaintiff in tampering with the gas well, preventing the gas from the well from being transported and obstructing further development, and the further fact of the producing oil well of 1918, we are persuaded to believe the first well served every purpose of delay rentals, and since there is no abandonment of the lease or the work of development, the contract was continued in full force and effect for the five-year period and as long as oil or gas was found in paying quantities, and "vested the defendant with a limited estate in the leased premises for further operation in accordance with the terms of the lease." Roach v. Junction Oil & Gas Company et al., 72 Oklahoma, 179 Pac. 934; Gypsy Oil Co. v. Cover et al., 78 Okla. 158, 189 Pac. 540.

We cannot see where it would serve any useful purpose to discuss in this opinion any other objections or points made or raised in the briefs of the parties. We are of the opinion that the trial of the case in the court below resulted in a righteous judgment between these parties. The judgment is affirmed.

By the Court: It is so ordered.