ELLA LONG ET AL., APPELLANTS, V. MAGNOLIA PETROLEUM COMPANY, APPELLEE.

89 N. W. 2d 245

Filed April 11, 1958. No. 34223.

*Halcomb, O'Brien, Knapp & Everson,* for appellants.

*Wright, Simmons & Harris, Charles B. Wallace, R. T. Wilkinson, Jr., Frank C. Bolton, Jr.,* and *Jack E. Earnest,* for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Kimball County. It involves an action initiated therein on December 16, 1955, by Ella Long, widow, and her five children to obtain the release of an oil and gas lease on record in Kimball County which had been entered into by them with the Magnolia Petroleum Company. The trial court dismissed the petition of plaintiffs. Plaintiffs thereupon filed a motion for new trial and, from the overruling thereof, took this appeal. We shall herein refer to the appellants as lessors and to appellee as lessee.

On September 11, 1950, the lessors entered into the oil and gas lease with lessee, a Texas corporation authorized to do business in the State of Nebraska. The lease covered approximately 1,280 acres of land in Kimball County. It was recorded on December 14, 1950, in Book 4, Oil and Gas Records of Kimball County, pages 391-393, in the office of the county clerk of Kimball County. The statutory procedural steps required by sections 57-201 to 57-204, R. S. Supp., 1955, were complied with by the parties to the lease, which procedures raised the issue of whether or not the lease had become "forfeited" (terminated). This action was thereupon instituted by the lessors under and pursuant to the authority of section 57-205, R. R. S. 1943.

The basis for the action is the claim that the lease, as to approximately 1,160 acres covered thereby, had terminated because the lessee had failed to pay the (delay) rental due thereunder as of September 11, 1955. In this respect we said in Valentine Oil Co. v. Powers, 157 Neb. 71, 59 N. W. 2d 150: "* * * the responsibility of properly construing the lease and making timely payment or tender of delay rentals is imposed upon the lessee or his assignee, * * *." One hundred twenty acres of land covered by the lease were farmed out by lessee to the Sunbeam Oil Company and is not involved in this action as the lessors admit that the Sunbeam Oil Company paid the rental thereon which they claim was due under the terms of the lease on September 11, 1955.

The lessee, within the time provided for that purpose by section 57-204, R. S. Supp., 1955, notified the county clerk, ex officio register of deeds of Kimball County, in writing that the "lease has not been forfeited" and that it claimed the lease to be in full force and effect. Under this situation this section of the statute provides: "* * * the owner of the land shall be entitled to the remedies now provided by law for the cancellation of such disputed lease." The statute so providing is section 57-205, R. R. S. 1943, and it provides that: "Should the

owner of such lease neglect or refuse to execute a surrender as provided in section 57-201, then the owner of the leased premises may sue in any court of competent jurisdiction to obtain such surrender, and he may also recover in such action of the lessee, his successors or assigns, the sum of one hundred dollars as damages, and all costs, together with a reasonable attorney's fee for preparing and prosecuting the suit, and any additional damages that the evidence in the case will warrant. In all such actions, writs of attachment may issue as in other cases."

Lessors asked for but were refused a jury trial, the matter being tried to the court. They now contend such refusal was prejudicial error, claiming the present action is a law action. It will be noted that the Legislature, in section 57-204, R. S. Supp., 1955, referred to such action as one for the "cancellation of such disputed lease."

We said in Yeiser v. Broadwell, 80 Neb. 718, 115 N. W. 293, that: "In a law action a party is entitled to a jury trial as a matter of right. Const., art. I, sec. 6. Lett v. Hammond, 59 Neb. 339, * * *." See, also, Gandy v. Wiltse, 79 Neb. 280, 112 N. W. 569.

And in In re Guardianship of Warner, 137 Neb. 25, 288 N. W. 39, we said: "* * * section 6, art. I of our Constitution, provides: 'The right of trial by jury shall remain involate,' etc. We are committed to the view that this provision does not create or extend, but merely operates to preserve, the right of jury trial as it existed prior to the adoption of our Constitution of 1875. In other words, it may not be curtailed."

However, as stated in Mills v. Heckendorn, 135 Neb. 294, 281 N. W. 49: "The essential character of the cause of action and the remedy or relief it seeks, as shown by the allegations of the complaint, determine whether a particular action is one at law or in equity, unaffected by the conclusions of the pleader or what the pleader calls it, or the prayer for relief."

Section 25-21,112, R. R. S. 1943, provides: "Action to quiet title; scope of relief. An action may be brought and prosecuted to final decree, judgment or order, by any person or persons, whether in actual possession or not, claiming title to, or an estate in real estate against any person or persons who claim, or apparently have an adverse estate or interest therein, for the purpose of determining such estate or interest, canceling unenforceable liens, or claims against, or which appear to be against said real estate, and quieting the title to real estate."

Section 25-21,120, R. R. S. 1943, provides: "Action to quiet title; trial; appeal. The court shall try such cause in like manner as other equitable actions and shall enter therein such orders and decrees as the parties may be entitled to. Appeals from final orders may be had as in other actions."

We think the essential character of the relief sought by the lessors is a surrender (cancellation) of the lease, thus bringing the action specifically within those referred to in section 25-21,112, R. R. S. 1943, and the fact that the statute (§ 57-205, R. R. S. 1943) provides the lessor may also recover therein damages, costs, and an attorney's fee does not change the essential character thereof.

Lessors call our attention to the fact that the Montana Supreme Court has held to the contrary under similar statutes. See Solberg v. Sunburst Oil & Gas Co., 70 Mont. 177, 225 P. 612. They then cite the following principles and, based thereon, argue we should follow that court:

"It is a general rule of law that, where a question of statutory construction is one of novel impression, it is proper to resort to decisions of courts of other states construing statutory language which is identical or of similar import. Indeed, it is highly desirable that a statute be given a similar interpretation by the courts

of the several states wherein it is in force." 50 Am. Jur., Statutes, § 323, p. 315.

"When a statute has been adopted from another state, ordinarily the construction given prior to its adoption by the courts of that state will be followed in this state, in the absence of any indication of a contrary intention on the part of the Legislature." Illian v. McManaman, 156 Neb. 12, 54 N. W. 2d 244.

While these principles have application in situations to which it can be said they apply we do not think they are controlling here for the following reasons: First, we do not think the statutory construction here is one of novel impression; second, there is nothing in the record to show that we adopted our statutes on this subject from Montana; third, we are obliged to follow our statutes relating thereto; and fourth, we do not agree with the reasoning of the Montana court to the effect that because the statute also authorizes judgment for a penalty ($100), attorney's fee, and damages, when a lease has been forfeited, it thereby becomes an action at law when the essential purpose of the action is to obtain the cancellation thereof. As stated in the Montana opinion: "First the forfeiture must be shown" and "Unless a forfeiture has occurred, there is no right of recovery of the penalty or damages, * * *." That, we think, is the essential character of the action and what rights flow therefrom, such as a penalty, costs, attorney's fee, and any additional damages that the evidence will warrant are only ancillary thereto. As stated in 1 C. J. S., Actions, § 54, p. 1158: "Actions of an equitable nature include * * * an action for the cancellation of an instrument, * * * Where both legal and equitable relief are demanded, or are essential to a complete determination of the controversy, the action is ordinarily classified according to what appears to be its primary purpose. * * * if the primary cause of action is equitable, the case is of an equitable nature, although incidental issues are of a legal nature. Hence, as of an equitable char-

acter, have been classified * * * an action which, although ultimately for the recovery of a money judgment, makes such recovery dependent upon the cancellation or reformation of an instrument which is also sought; * * *."

We find the trial court was correct in denying lessors a jury trial.

Lessors further contend the trial court did not properly limit the issues on the part of the lessee when it permitted it to defend the action on grounds other than those advanced by it prior to the beginning of this litigation (See O'Neil v. Union Nat. Life Ins. Co., 162 Neb. 284, 75 N. W. 2d 739; Kucera v. Kavan, 165 Neb. 131, 84 N. W. 2d 207) and on grounds other than those set out in its pleadings filed in the action. They also contend the trial court, by its holding, decided the cause on issues not properly before it in view of the pretrial order relating thereto, to which neither of the parties took any exceptions. Since this is an equity action, and we must review the record de novo, the following has application to the latter contention: "A wrong reason for a correct conclusion does not militate against the decision." Stratbucker v. Junge, 153 Neb. 885, 46 N. W. 2d 486.

Our Revised Rules, as they relate to "Pre-Trial Procedure" and the formulating of issues thereby, provide: "The court shall at the time of the pre-trial hearing make a record of the proceedings which recites the action taken at the conference, the amendments allowed to the pleadings, and the amendments made by the parties as to any of the matters considered, and which limits the issues for trial to those not disposed of by admissions or agreements of counsel; that counsel shall forthwith acknowledge their assent thereto, or, in the alternative, state into the record any and all objections they may have thereto; and such order when entered controls the subsequent course of the action, unless modified at the

trial to prevent manifest injustice." Revised Rules, 1957, Supreme Court of Nebraska, page 35.

The purpose of a pretrial conference is to simplify the issues; amend the pleadings, when necessary; and avoid unnecessary proof of facts at the trial. See, McDonald v. Bowles, 152 F. 2d 741; Jenkins v. Devine Foods, Inc., 3 N. J. 450, 70 A. 2d 736, 22 A. L. R. 2d 593; Hensgen Bros., Inc. v. Grip, 13 N. J. Super. 105, 80 A. 2d 207.

The participants in a pretrial conference must adhere to the spirit of that procedure and are held to have waived questions not there presented. See, Jenkins v. Devine Foods, Inc., *supra;* Hensgen Bros., Inc. v. Grip, *supra.*

Modification may be had at the trial to prevent manifest injustice, but the modification should be by direction and not by indirection. That is, modification must be attended by a degree of directness and formality such as is appropriate to a court order of such magnitude that from the time of its entry it "controls the subsequent course of action." See, Jenkins v. Devine Foods, Inc., *supra;* Hensgen Bros., Inc. v. Grip, *supra.*

The subsequent course of an action is controlled by the agreements made at pretrial conference so long as they remain unmodified. See Johnson v. Glassley, 118 Ind. App. 704, 83 N. E. 2d 488. And that would be true on appeal. See Carlson v. Hannah, 6 N. J. 202, 78 A. 2d 83. We shall consider the appeal accordingly.

Insofar as material to this appeal the lease provides as follows:

"2. Subject to the other provisions herein contained, this lease shall remain in force for a term of ten (10) years from this date (called 'primary term'), and as long thereafter as oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, is produced from said land or land with which said land is pooled.

"3. The royalties to be paid by lessee are: (a) on oil, and on other liquid hydrocarbons saved at the well, one-

eighth of that produced and saved from said land, same to be delivered free of cost at the wells or to the credit of lessor in the pipe line to which the wells may be connected; (b) on gas, including casinghead gas and all gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the mouth of the well of one-eighth of the gas sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; and (c) if at any time while there is a gas well or wells on the above land (and for the purposes of this clause (c) the term 'gas well' shall include wells capable of producing natural gas, condensate, distillate or any gaseous substance and wells classified as gas wells by any governmental authority) such well or wells are shut in, and if this lease is not continued in force by some other provision hereof, then it shall nevertheless continue in force for a period of ninety (90) days from the date such well or wells are shut in, and before the expiration of any such ninety-day (90-day) period, lessee or any assignee hereunder may pay or tender an advance annual royalty equal to the amount of delay rentals provided for in this lease for the acreage then held under this lease by the party making such payment or tender, and if such payment or tender is made, this lease shall continue in force and it shall be considered that gas is being produced from the leased premises in paying quantities within the meaning of paragraph 2 hereof for one (1) year from the date such well or wells are shut in, and in like manner subsequent advance annual royalty payments may be made or tendered and this lease shall continue in force and it will be considered that gas is being produced from the leased premises in paying quantities within the meaning of said paragraph 2 during any annual period for which such royalty is so paid or tendered; such advance royalty may be paid or tendered in the same manner as pro-

vided herein for the payment or tender of delay rentals; royalty accruing to the owners thereof on any production from the leased premises during any annual period for which advance royalty is paid may be credited against such advance payment.

"4. If operations for drilling are not commenced on said land or on land pooled therewith on or before one (1) year from this date, this lease shall terminate as to both parties, unless on or before one (1) year from this date lessee shall pay or tender to the lessor a rental of One Thousand Two Hundred Eighty & No/100 Dollars ($1280.00) which shall cover the privilege of deferring commencement of such operations for a period of twelve (12) months. In like manner and upon like payments or tenders, annually, the commencement of said operations may be further deferred for successive periods of the same number of months, each during the primary term. * * *

"6. If, prior to discovery of oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, on said land or on land pooled therewith, lessee should drill and abandon a dry hole or holes thereon, or if, after discovery of oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter, or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three (3) months from the date of completion and abandonment of said dry hole or holes or the cessation of production. If, at the expiration of the primary term, oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, is not being produced on said land or land pooled therewith but lessee is then engaged in operations for drilling, mining, or reworking of any well or wells thereon, this

lease shall remain in force so long as such operations or said additional operations are commenced and prosecuted (whether on the same or successive wells) with no cessation of more than sixty (60) consecutive days, and, if they result in production, so long thereafter as oil, liquid hydrocarbons, gas or their respective constituent products, or any of them, is produced from said land or land pooled therewith. In the event a well or wells producing oil or gas in paying quantities should be brought in on adjacent land and within three hundred thirty feet (330 ft.) of and draining the leased premises, lessee agrees to drill such offset wells as a reasonably prudent operator would drill under the same or similar circumstances."

It is admitted that lessee did not pay or tender payment of any rentals on or before September 11, 1955, on the 1,160 acres herein involved. Lessee contends that under the factual situation here presented the lease did not require it to do so.

As to the construction of the lease the following principles are applicable. See Hafeman v. Gem Oil Co., 163 Neb. 438, 80 N. W. 2d 139.

" 'Where there is a question as to the meaning of a contract, it is to be construed most strongly against the party preparing it.' Greenough v. Willcox, 213 N. W. 175 (238 Mich. 52)." Ericson v. Nebraska-Iowa Farm Investment Co., 134 Neb. 391, 278 N. W. 841.

"When a contract is optional in respect to one party it is to be construed strictly in favor of the party that is bound and against the one who is not bound." McDaniel v. Hager-Stevenson Oil Co., 75 Mont. 356, 243 P. 582.

"In construing a written instrument for the purpose of ascertaining the intention of the parties, resort must be had to the instrument as a whole and, if possible, effect must be given to every part thereof." Smith v. United States Fidelity & Guaranty Co., 142 Neb. 321, 6

N. W. 2d 81. See, also, Hansen v. E. L. Bruce Co., 162 Neb. 759, 77 N. W. 2d 458.

"In construing a writing it is the duty of the court to give to words used their ordinary and popularly accepted meaning in the absence of explanation or qualification." Peetz v. Masek Auto Supply Co., 161 Neb. 588, 74 N. W. 2d 474.

"A written contract expressed by clear and unambiguous language is not subject to interpretation or construction." Hansen v. E. L. Bruce Co., *supra*. See, also, Hafeman v. Gem Oil Co., *supra*.

Courts, in construing any written instrument, must construe the same so as to carry into effect the intention of the parties as found in the language the parties used. Courts are not at liberty to rewrite the contracts made by the parties, nor should the courts add language to that used by the parties and thus change the plain expressed intention of the parties as set out in the contract.

"The intention of the parties to a written contract expressed by clear and unambiguous language must be determined from its contents." Hansen v. E. L. Bruce Co., *supra*.

It will be noted that the habendum clause (section 2) does not merely provide for a primary term of 10 years, and as long thereafter as production continues, but makes such terms subject to the other provisions therein contained, which would include sections 3, 4, and 6. See Rogers v. Osborn, 152 Tex. 540, 261 S. W. 2d 311.

Section 4 of the lease, during the primary term thereof with which we are here concerned, created, as long as it had application, what is referred to in the oil and gas industry as an "unless" lease. As stated in 2 Summers Oil & Gas (Perm. Ed.), § 339, p. 223: "An important distinction in the legal relations between lessor and lessee under the drill or pay type of lease and the unless type of lease which has been heretofore mentioned, is that under the drill or pay lease the lessee expressly

promises to drill or pay; but under the unless lease the contract merely provides that if the lessee does not drill within a stipulated time the lease is void unless he pays. There being no promise on part of the lessee under the unless lease to pay the delay rental there is no duty to pay, and an action consequently cannot be maintained to recover it. The provision for payment is looked upon as merely stating a condition upon which, in absence of drilling, the lease may be continued or terminated."

We held in Fritsche v. Turner, 133 Neb. 633, 276 N. W. 403, by quoting from McKinlay v. Feagins, 82 Okl. 193, 198 P. 997, that: " 'An oil and gas lease containing the "unless" clause confers an optional right upon the lessee, and should be strictly construed in favor of the lessor and against the lessee, and time is of the essence of the contract.' * * * a failure on the part of the lessee to commence the drilling of a well or to pay the rental as stipulated automatically terminated the lease contract." See, also, Valentine Oil Co. v. Powers, *supra.* As therein held: "Such a delay rental clause is a special limitation, time is of the essence of the contract, and failure of the lessee or his assigns to tender or pay rentals within the specified time automatically terminates the lease without any affirmative action by the lessor, or any one else, for that purpose." And: "As stated in Humble Oil Co. v. Davis (Tex. Comm. App.), 296 S. W. 285: 'It was a limitation upon the term or period of the grant, and, upon the failure to drill or pay as aforesaid, the estate created by the lease ceased and reverted to the lessors.' " See, also, McNamer Realty Co. v. Sunburst Oil & Gas Co., 76 Mont. 332, 247 P. 166; Hopkins v. Zeigler, 259 F. 43; Berthelote v. Loy Oil Co., 95 Mont. 434, 28 P. 2d 187; Colby v. Sun Oil Co. (Tex. Civ. App.), 288 S. W. 2d 221; W. T. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S. W. 2d 27.

It is true that equity does not favor forfeitures. See, Hannah v. American Live Stock Ins. Co., 111 Neb. 660, 197 N. W. 404; Donnelly v. Sovereign Camp, W.O.W., 111

Neb. 499, 197 N. W. 125; Wisdom v. Minchen (Tex. Civ. App.), 154 S. W. 2d 330; West v. Continental Oil Co., 91 F. Supp. 505. As stated in Hannah v. American Live Stock Ins. Co., *supra*: " 'Forfeitures are looked upon by courts with ill favor, and will be enforced only when the strict letter of the contract requires it; * * *.' Haas v. Mutual Life Ins. Co., 84 Neb. 682." However, it is also true that forfeit and terminate are not synonymous. See, Schneider v. Springmann, 25 F. 2d 255; Kugel v. Young, 132 Colo. 529, 291 P. 2d 695; Woodson Oil Co. v. Pruett (Tex. Civ. App.), 281 S. W. 2d 159; Gillespie v. Bobo, 271 F. 641; Baldwin v. Kubetz, 148 Cal. App. 2d 937, 307 P. 2d 1005. As stated in Kugel v. Young, *supra*: "While appellate courts, through the use of inaccurate terminology, have frequently referred to the termination of an unless lease as a 'forfeiture,' there actually is no element of forfeiture involved. The lessor is not required to do anything, but the lessee's failure to meet the conditions of the contract automatically terminates it. The interest created in the lessee by such a lease does not become forfeited upon failure to comply with its conditions; it simply expires." When a lease terminates by its own terms the equitable rule as to relieving against forfeitures is not applicable thereto.

A producing oil well was brought in on the premises on November 12, 1952. This brought into play the provisions of section 6 of the lease. Lessee contends that the provisions of section 4 and section 6, as they relate to the lease terminating, are different and result in different legal statuses between the lessors and lessee. In this respect section 4 provides "this lease shall terminate * * * unless" whereas section 6 provides "this lease shall not terminate if." Lessee concedes the language of section 4 is a clause of specific limitation but contends the language of section 6, when applicable, creates a condition subsequent. In view of what we hereinafter find the evidence adduced establishes it is not necessary to answer this question although it presents a very nice

question of law. See Knight v. Chicago Corp., 144 Tex. 98, 188 S. W. 2d 564. A discussion thereof may be found in South Penn Oil Co. v. Snodgrass, 71 W. Va. 438, 76 S. E. 961, 43 L. R. A. N. S. 848; Colby v. Sun Oil Co., *supra;* Carrothers v. Stanolind Oil & Gas Co., 134 F. Supp. 191.

In view of the fact that a producing well was brought in on the premises in November 1952 we come first to the factual question of whether or not, within the meaning of the language of section 6 of the lease which is applicable thereto, the production thereof had ceased for any cause prior to September 11, 1955, and, if it had, whether or not the lessee had exercised any of the other permissive methods therein provided to prevent the lease from terminating. In order to properly answer the first phase of the foregoing statement it is necessary to determine what the parties meant by the use of the following language therein contained, to wit: "* * * if, after discovery of oil, * * * the production thereof should cease from any cause, * * *."

It is lessors' position that the word "production," whenever used in the lease, means "production in paying quantities," which is generally defined by the courts as follows: " 'The general test of production in paying quantities is whether it is reasonably possible to market or use gas (here oil) producible at date of completion of the well and immediately thereafter with some pecuniary profit, excluding from consideration expenses and liabilities incurred in bringing the well to completion.' " Continental Oil Co. v. Boston-Texas Land Trust, 221 F. 2d 124. See, also, annotations in 48 A. L. R. at page 887, 84 A. L. R. at page 761, and 91 A. L. R. at page 900. And this is the construction placed by most courts on the period following the "primary term" of a lease although only the word "production" is used in the lease in relation thereto. As said in Garcia v. King, 139 Tex. 578, 164 S. W. 2d 509: " 'Frequently oil and gas leases in the "thereafter" clause provide that the lease is to continue

after the fixed term so long as oil or gas is produced in "paying quantities." Most courts hold the legal effect of that clause and of the one "so long as oil and gas is produced" to be the same; and to extend the lease under a clause such as is before us, the production must be in paying quantities.' (Berthelote v. Loy Oil Co., 95 Mont. 434, 28 P. 2d 187.)" There is, however, authority to the contrary. See Denker v. Mid-Continent Petroleum Corp., 56 F. 2d 725, 84 A. L. R. 756. In Garcia v. King, *supra,* the court discussed the reason for its holding in the following language: "In order to understand and properly interpret the language used by the parties we must consider the objects and purposes intended to be accomplished by them in entering into the contract. The object of the contract was to secure development of the property for the mutual benefit of the parties. It was contemplated that this would be done during the primary period of the contract. So far as the lessees were concerned, the object in providing for a continuation of the lease for an indefinite time after the expiration of the primary period, was to allow the lessees to reap the full fruits of the investments made by them in developing the property. Obviously, if the lease could no longer be operated at a profit, there were no fruits for them to reap. The lessors should not be required to suffer a continuation of the lease after the expiration of the primary period merely for speculation purposes on the part of the lessees. Since the lease was no longer yielding a profit to the lessees at the termination of the primary period, the object sought to be accomplished by the continuation thereof had ceased, and the lease had terminated." However, these cases do not relate to the primary term. That the parties so understood the meaning of the word "produced" in section 2 as it related to the period after the primary term is evidenced by subsection (c) of section 3 of the lease.

That the parties to the lease understood there was a difference in meaning between the use of the word pro-

duction and to produce in paying quantities is evidenced by the use of these expressions in different provisions of the lease. As we have already said, courts are not at liberty to rewrite the contract made by the parties, nor should the courts add language to that used by the parties and thus change the plain expressed intention of the parties as set out in the contract. And, as stated in Peetz v. Masek Auto Supply Co., *supra:* "* * * it is the duty of the court to give to words used their ordinary and popularly accepted meaning in the absence of explanation or qualification." "Cease," according to Webster's New Twentieth Century Dictionary (2d Ed.), page 289, means "to end; to stop; to discontinue" and this, we believe, is the ordinary and popularly accepted meaning thereof and the one here intended by the parties. And, as stated in Rogers v. Osborn, *supra:* "The word 'production' means marketable oil or gas."

We think the following language of section 6 of the lease, to wit, "if, after discovery of oil, * * * the production thereof should cease from any cause," has no application when, during the primary term of the lease to which it has application, the lessee, in good faith and with reasonable diligence, works, or causes to be reworked, a well thereon which is producing marketable oil in some quantity, the amount thereof not being controlling as the word cease means to end, stop, or discontinue. While we have found no case directly in point so holding, the cases of Baker v. Huffman, 176 Kan. 554, 271 P. 2d 276, and Murphy v. Garfield Oil Co., 98 Okl. 273, 225 P. 676, discuss the question. As stated in Murphy v. Garfield Oil Co., *supra:* "If an oil well or gas well drilled, whether oil or gas was in paying quantities or not—just so oil or gas was obtained—not a dry hole—one such well was sufficient to prolong the life of the contract for the initiative period and to keep the contract in force; after the initiative period oil or gas in paying quantities were necessary. The first five years of the contract is given for the purpose of exploring, and

a well with any showing of oil or gas is sufficient consideration under the terms of this contract for this period, but oil or gas in paying quantities must be had to continue the contract after this period, and this is reasonable." Therein the court went on to say: "The business of exploring for oil and gas and of producing the same is uncertain and expensive. One must command large capital and take a long time to drill a well in search of these elements. There is nothing certain as to where they are situated in the earth and there is no way of knowing except to send the drill into the earth. After all the work and the great expense, the result is more often than otherwise a dry hole and the lessee loses his time and money and has no encouragement to continue the adventure. Sometimes the result is a small showing of oil and gas and the lessee is encouraged to continue the adventure, and it is only reasonable and right that he should have the full exploring period set out in the contract to make successful the adventure." In Baker v. Huffman, *supra,* the court went on to say: "We find nothing in the contract providing for a forfeiture or cancellation of the lease for the failure of the lessees to produce oil and gas in paying quantities during the primary term of the lease. The failure of lessees to produce or failure, alone, of production in paying quantities during the primary term of the lease did not result in a defeasance ipso facto. To hold otherwise would be to read into the lease express provisions which did not exist, and this we cannot do."

Lessee brought in Ella Long No. 1 as a producing well on the leased premises on November 12, 1952, at a cost of $93,037.51. There was put up in connection with this well 4 stock (storage) tanks for marketable oil and a heater treater to be used for removing water and basic sediment from the fluid pumped from the well in case the fluid pumped was not oil of marketable (salable) quality. This well came in as a good producer and continued to produce quite well until December

1954 when the amount of fluid pumped not only declined materially in quantity but also in quality to the point where it could not be pumped directly into the stock tanks but, beginning with December 11, 1954, it had to be pumped directly into the heater treater for treatment before it was fit for sale.

With this general decline in the amount of fluid obtainable from the well the lessee began, and carried out for about 2 months, what is referred to as a pumping schedule. This consists of pumping the well either 4, 8, or 16 hours a day over a period of some 2 weeks to a month for each thereof, thus allowing time for additional fluid to enter the well base to be pumped out. This is a generally recognized production practice used in the oil industry to increase the flow of a well and often results in doing so. However, in this instance it did not do so.

When this method failed the lessee endeavored to increase the well's capacity to produce by reworking it with what is referred to in the record as a "sandfrac" treatment which is performed with some fluid (in this case water and oil). This fluid is flushed down the well bore under pressure in order to put new fractures in the producing formation and also clean out the old fractures which nature had created therein, thus providing openings for the oil to flow into the well bore. This job was started on February 14, 1955, and completed on February 23, 1955, at a cost of $3,551. Pumping was again started on February 23, 1955, and, by March 7, 1955, all of the oil used in the reworking of the well had been recovered.

After all the oil used had been recovered the lessee continued to pump the well but no substantial increase in the flow was obtained by the work done.

A "run" is a transfer of crude oil from the stock tanks, where it is stored on the leased premises after production, to a pipe line. The record shows that in November 1954 lessee made a run of 343.07 barrels of oil from the stock

tanks of Ella Long No. 1 and in October 1955 a run of 338.32 barrels of oil therefrom. While not large it shows that lessee was operating this well during this period and securing salable oil therefrom, although most of it had to be treated. We have examined all of the evidence relating thereto and while there is conflict therein we have come to the conclusion that lessee operated the well on Ella Long No. 1 during all of the time herein material in good faith and with an honest endeavor to increase the production therefrom and, as a result, the production therefrom never ceased from any cause within the intent and meaning of section 6, so as to make the provisions thereof relating to the payment of rentals applicable. In view thereof we find lessors' contention that by lessee's failure to pay rent on or before September 11, 1955, they were entitled to have the lease declared void and canceled to be without merit.

Earlier in this opinion we mentioned the fact that lessee had farmed out to the Sunbeam Oil Company a tract of 120 acres of the total it had leased from lessors. On July 15, 1955, the Sunbeam Oil Company commenced to drill a well thereon and continued to do so until July 26, 1955, when it had reached a depth of 6,160 feet. It then abandoned the operation as a dry hole.

Assuming, solely for the purpose of discussion, that lessee had ceased to produce oil from Ella Long No. 1 at any time within 60 days prior to July 15, 1955, when Sunbeam commenced to drill, would that have extended the option to pay rent past September 11, 1955? In this respect the lease provides in section 6: "* * * if, after discovery of oil, * * * the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling * * * operations within sixty (60) days thereafter, or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three (3) months from date of completion and abandonment of said dry hole or holes

or the cessation of production." Since the additional drilling was not abandoned as a dry hole until July 26, 1955, the time to commence or resume the payment of rentals extended beyond September 11, 1955, and consequently lessee could not be in default thereof.

In addition to the two wells already referred to two other dry holes were dug on the leased premises: One, referred to as Sunbeam and Stout Ella Long, in July 1953; and the other, by Rogers Oil Company and referred to as Travis No. 1, in August 1953. Both were dug under farm-out arrangements with the lessee.

Since September 11, 1955, the lessee has brought in Ella Long B No. 1 as a producer at a cost of $61,226.17. The site therefor was staked out on September 23, 1955; it was prepared for drilling on September 26, 1955; the well was spudded in on October 7, 1955; and it was brought in as a producer on November 1, 1955, and seems to have good flow. Lessee, on November 17, 1955, selected a site for Ella Long No. 2 but has not proceeded to spud it in because of this litigation. In addition thereto Ella Long No. 1 was restored to better production in March 1956.

The foregoing has nothing to do with the immediate question herein involved, that is, whether or not production had ceased, but does bear on the good faith and reasonable diligence with which lessee has and is developing the leased premises during the primary period of the lease.

Other questions have been raised by the parties but in view of what we have said and held herein a discussion thereof becomes unnecessary. We find the action taken by the trial court to be correct and therefore affirm its judgment dismissing the petition of lessors.

AFFIRMED.